**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SHANIQUE PEREZ, | : | | |
| Plaintiff, | : | Civil Action No.: | 21-929 (RC) |
| v. | : | Re Document Nos.: | 84, 85, 86, 87, 88, 89, 95, 97, 100, 101, 102, 103, 106, 113, 132, 133, 145, 146, 158, 168, 169, 181, 184, 185 |
| KIPP DC SUPPORTING CORP. et al, | : | | |
| Defendant. | : | | |

# MEMORANDUM OPINION

**GRANTING KIPP DC'S MOTION FOR SUMMARY JUDGMENT; GRANTING CAPITAL CITY'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Shanique Perez brings claims for gross negligence; grossly negligent hiring, supervision, and retention; intentional infliction of emotional distress; and premises liability against two District of Columbia schools—KIPP DC Public Charter Schools and Capital City Public Charter School (collectively, "Defendants")—for failing to prevent a teacher, Alan Coleman, from subjecting her to years of sexual abuse and harassment. Coleman first taught middle school at KIPP DC, where Ms. Perez was his student during the 2003–2004 and 2004–2005 school years. After the summer of 2005, Coleman began teaching at Capital City and Ms. Perez left KIPP DC to begin high school at another school, the Madeira School. Over a decade later, Ms. Perez confided in another former teacher that Coleman began sexually abusing her while she was his student at KIPP DC and continued doing so while he was employed at Capital City. Criminal proceedings commenced against Coleman in Maryland and the District of

Columbia, and in 2017, Coleman pleaded guilty to sex abuse of a minor in Maryland and to first-degree child sex abuse in the District of Columbia.

Ms. Perez's case against Defendants proceeded to discovery, which concluded on March 19, 2025. In the summer of 2025, KIPP DC and Capital City both filed motions for summary judgment on all claims and motions to limit or exclude as inadmissible certain opinions offered by Ms. Perez's standard-of-care expert, Dr. Billie-Jo Grant, and her psychological expert, Dr. Melissa Blackwell. At that point, Ms. Perez was represented by Ketterer, Browne & Associates, PLLC. However, as Ms. Perez's responses to Defendants' motions became due, Ms. Perez argued that she was receiving ineffective assistance of counsel and filed a motion to dismiss Ketterer, Browne & Associates as her counsel. The Court then stayed all proceedings in this case and allowed Ms. Perez to continue pursuing her claims *pro se*.

In the past year, while the stay has been in place, Ms. Perez has filed various motions seeking diverse forms of relief, including to amend her complaint, impose sanctions on current Defendants, add new defendants, and re-open discovery. She has also filed *pro se* responses to Defendants' motions for summary judgment. However, she has declined to respond to Defendants' motions to exclude or limit her experts' opinions. Defendants oppose all forms of relief sought by Ms. Perez.

In the present motion, the Court resolves all pending dispositive and non-dispositive motions. Beginning with the non-dispositive motions, the Court denies all relief sought by Ms. Perez and enjoins her from making direct communications with KIPP DC's former President and CEO, Susan Schaeffler, as well as harassing or threatening communications with any other KIPP DC employee or potential witness for the remainder of this lawsuit. The Court then turns to Defendants' motions to limit or exclude certain opinions by Ms. Perez's standard-of-care and

psychological experts, and grants those as conceded. Finally, the Court considers Defendants' motions for summary judgment. For the reasons below, the Court grants KIPP DC and Capital City summary judgment as to all claims.[1]

## II. FACTUAL BACKGROUND

Ms. Perez first brought suit in 2018, alleging that starting when she was a middle-school student at KIPP DC, she suffered sexual abuse at the hands of her teacher, Alan Coleman. *See Doe v. KIPP DC Supporting Corp.*, 373 F. Supp. 3d 1, 5–6 (D.D.C. 2019). In her complaint, she named as defendants the corporation that owned the KIPP DC school; Alan Coleman; Capital City Public Charter School, which employed Coleman after he left KIPP DC in 2005; former KIPP DC President and CEO Susan Schaeffler; and unnamed KIPP DC employees. *Id.* at 5. Ms. Perez asserted claims under § 1983 and Title IX, as well as state-law claims of gross negligence, assault, battery, and intentional infliction of emotional distress. *Id.* at 6. The Court dismissed her 2018 complaint because the District of Columbia's relevant statutory limitations period had expired. *Id.* at 15.

Four months later, the District of Columbia enacted the Sexual Abuse Statute of Limitations Amendment Act of 2018, which extended the relevant statute of limitations for civil actions arising out of sexual abuse. *Perez v. KIPP DC Supporting Corp.* ("*Perez I*"), 590 F. Supp. 3d 150, 154 (D.D.C. 2022). Ms. Perez then filed the present action in 2021, reasserting many of the same claims against the same defendants. *Id.* at 156. Eventually, she voluntarily

[1] The Court also denies as moot or unavailing the following two motions: (1) Ms. Perez's motion to compel the Clerk of Court to administer an oath to facilitate her filing of documents in this case, ECF No. 158; and (2) Ms. Perez's motion for clarification of the Court's February 3, 2025 Minute Order granting in part her motion for religious accommodation, ECF No. 185.

dismissed Ms. Schaeffler,[2] the unnamed KIPP DC employees, and Coleman, leaving as sole defendants (1) KIPP DC Public Charter Schools and KIPP DC Supporting Corporation (collectively, "KIPP DC"), and (2) Capital City Public Charter School ("Capital City"). *See* First Am. Compl. ("FAC") ¶ 9, ECF No. 57.

The Court dismissed Ms. Perez's 2021 complaint on the ground of res judicata, *Perez I*, 590 F. Supp. 3d at 159, but on appeal, the D.C. Circuit reversed, *Perez v. Kipp DC Supporting Corp.* ("*Perez II*"), 70 F.4th 570, 571–72 (D.C. Cir. 2023). On remand, this Court dismissed Ms. Perez's Title IX claim as being untimely filed[3] and her claims sounding in simple negligence, from which public charter schools are immune under District of Columbia law. *Perez v. KIPP DC Supporting Corp.* ("*Perez III*"), No. 21-cv-929, 2024 WL 3534769, at *10–11, 14 (D.D.C. July 25, 2024). However, the Court allowed her other claims to proceed. *Id.* at *14. Accordingly, on July 31, 2024, Ms. Perez filed her First Amended Complaint ("FAC"), asserting claims against KIPP DC and Capital City for gross negligence; grossly negligent hiring, supervision, and retention; and intentional infliction of emotion distress; and against KIPP DC only for premises liability. FAC ¶¶ 125–97.

---

[2] In September of 2025, Ms. Perez wrote an email to opposing counsel indicating her intent to file a motion to strike or set aside her former counsel's voluntary dismissal of Ms. Schaeffler and to reinstate her as a defendant. KIPP DC's Reply in Supp. Mot. Prelim. Inj. at Ex. B, ECF No. 131-2. Ms. Perez claims that "[her] former counsel filed/consented to the dismissal of Ms. Schaeffler without conferring with [her] and without [her] authorization or consent" and that she has "since terminated/withdrawn prior counsel for negligence, and [is] proceeding pro se." *Id.* However, Ms. Perez never filed a motion to reinstate Ms. Schaeffler as a defendant.

[3] Ms. Perez, proceeding *pro se*, subsequently filed a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(6), requesting that the Court vacate its dismissal of her Title IX claim. Pl.'s Mot. Relief from J., ECF No. 168. Ms. Perez claims that the Court dismissed this claim on an undeveloped record, and that subsequent discovery has allowed her to plead new facts regarding "notice and institutional response" that warrant reinstatement of the claim. *Id.* at 1. However, the Court dismissed Ms. Perez's Title IX claim because it was untimely under the applicable statute of limitations, not because she failed to plead actual notice. Accordingly, Ms. Perez's motion for relief from judgment is denied.

Over the next nine months, the parties engaged in extensive discovery, including depositions of Ms. Schaeffler and other KIPP DC and Capital City personnel. In July 2025, KIPP DC and Capital City moved for summary judgment on all counts. *See* KIPP DC's Mot. for Summ. J., ECF No. 86; Capital City's Mot. for Summ. J., ECF No. 87. Defendants also moved to exclude or limit certain opinions by Ms. Perez's experts. *See* KIPP DC's Mot. Exclude Test. of Dr. Grant ("KIPP DC's 1st Mot. in Limine"), ECF No. 84; KIPP DC's Mot. Exclude Certain Opinions of Dr. Blackwell ("KIPP DC's 2d Mot. in Limine"), ECF No. 85; Capital City's Mot. Exclude Dr. Grant ("Capital City's 1st Mot. in Limine"), ECF No. 88; Capital City's Mot. Partially Exclude Dr. Blackwell ("Capital City's 2d Mot. in Limine"), ECF No. 89.

Below, the Court first addresses several non-dispositive motions filed by Defendants and Ms. Perez, starting with KIPP DC's motion to enjoin Ms. Perez from making direct communications with KIPP DC personnel and concluding with Ms. Perez's various motions. The Court then turns to Defendants' motions to limit or exclude Ms. Perez's experts and finally Defendants' motions for summary judgment.

## III. ANALYSIS

### A. KIPP DC's Motion for a Preliminary Injunction (ECF No. 95); Ms. Perez's Motion for a Protective Injunction (ECF No. 101)

KIPP DC seeks a preliminary injunction prohibiting Ms. Perez from personally communicating with represented parties and witnesses outside of formal communications through counsel while this litigation is pending. KIPP DC's Mot. Prelim. Inj. at 1, ECF No. 95. In the summer of 2025, Ms. Perez began directly contacting KIPP DC personnel and board members regarding their involvement in her lawsuit. KIPP DC then attempted to resolve the issue without court intervention by requesting that she cease these communications. *Id.* at 5.

When those efforts proved unsuccessful, KIPP DC filed this motion for a preliminary injunction. *Id.* In response, Ms. Perez filed a motion for a "protective injunction," asking the Court to prohibit KIPP DC from filing its injunction. Pl.'s Mot. Protective Inj. at 2–3, ECF No. 101. She argues that KIPP DC is infringing on her First Amendment rights and is using the litigation process as a "tool for intimidation." *Id.*

Finding that KIPP DC has satisfied the requirements for a preliminary injunction, the Court grants its motion in part. However, the Court declines to impose a total ban on Ms. Perez's communications with all KIPP DC personnel. Instead, as a narrower remedy, Ms. Perez is prohibited from making any direct communications with former KIPP DC President and CEO Susan Schaeffler and from making harassing or threatening communications with any KIPP DC personnel or potential witnesses for the remainder of this lawsuit, including any appeal. And because Ms. Perez has not demonstrated that the relief that she seeks is warranted, the Court denies her motion for a protective injunction.

1. Background

On or around June 30, 2025, with this action pending, Ms. Perez stood outside two KIPP DC campuses where Ms. Schaeffler was scheduled to be present and held up signs that referenced her and the school. KIPP DC's Mot. Prelim. Inj. at 2. One sign stated, "I WAS SEX TRAFFICKED BY SUSAN SCHAFFLER [sic]." *Id.* Another sign stated, "SUSAN SCHAEFFLER GHISLANE MAXWELL." [4] *Id.* At the time, Ms. Perez was represented by counsel, so KIPP DC's counsel contacted her counsel directly about the situation. They sent a

[4] Ms. Perez appeared to be comparing Ms. Schaeffler to Ghislaine Maxwell, who is widely known for being criminally convicted and sentenced to federal prison for her role in a scheme to sexually exploit and abuse multiple minor girls with Jeffrey Epstein. *See, e.g.*, *Ghislaine Maxwell Sentenced To 20 Years In Prison For Conspiring With Jeffrey Epstein to Sexually Abuse Minors*, Dep't of Just. (June 28, 2022).

formal cease-and-desist letter that same day, claiming that Ms. Perez's conduct constituted slander, libel, defamation, and business disparagement. *Id.* at Ex. F, ECF No. 95-6. The letter demanded that Ms. Perez (1) stop making any false, defamatory, or disparaging statements about KIPP DC and its employees, (2) remove all related social media posts and publications, and (3) preserve all physical and electronic evidence—including records, correspondence, social media content, and protest signs—related to the matter. *Id.*

Ms. Perez's behavior did not change. During July and August 2025, Ms. Perez made several posts on social media disparaging KIPP DC and Ms. Schaeffler. KIPP DC's Mot. Prelim. Inj. at 3. In one post, she wrote: "Mistress of the Market Susan Schaeffler is a human trafficker. #GhislaneMaxwell of education. KIPP: KIDS IN PEDOPHILE PROGRAM." *Id.* On or about August 12, 2025, Ms. Perez began contacting KIPP DC personnel directly through Instagram and text message. *Id.* at 3–4. Via text message, Perez used language that indicated she was willing to fight Ms. Schaeffler. *Id.* at 4. Specifically, Ms. Perez used the phrase "on sight," which Ms. Schaeffler is aware is a slang term meaning wanting to fight or injure someone upon seeing them. *Id.* at 4–5. Based on these communications, Ms. Schaeffler expressed concern for her personal safety. *Id.* at 5.

On August 22, 2025, KIPP DC filed the present motion for a preliminary injunction against Ms. Perez, requesting that the Court enjoin her from personally communicating with KIPP DC employees and board members outside of formal communications through counsel while this litigation is pending. *Id.* at 1. KIPP DC claims that Ms. Perez has attempted to intimidate and threaten its personnel who may be witnesses and that she has not been deterred by KIPP DC's attempts to stop her conduct without court intervention. *Id.*

On September 5, 2025, Ms. Perez dismissed her counsel and decided to pursue her claims *pro se*. Pl.'s Mot. Dismiss Counsel at 2, ECF No. 99. Ms. Perez then filed an opposition to KIPP DC's motion, arguing that its preliminary injunction seeks to restrain her First Amendment activity and "chill [] prosecution of her claims." Pl.'s Opp'n to KIPP DC's Mot. Prelim. Inj. at 2–3, ECF No. 112.[5] KIPP DC replied, explaining that Ms. Perez's threats and intimidation are not protected speech. KIPP DC's Reply in Supp. Mot. Prelim. Inj. at 4–5, ECF No. 131. Ms. Perez filed her own motion for a "protective injunction" against KIPP DC, requesting that the Court (1) "prohibit[] Defendants from filing preliminary injunctions or similar motions aimed at penalizing or chilling Plaintiff's exercise of her constitutional rights," (2) "[o]rder that Defendants' August 22, 2025 Notice of Preliminary Injunction be stricken as frivolous and harassing," and (3) "[a]dmonish or sanction Defendants under Fed. R. Civ. P. 11(b)(1) for misuse of litigation filings."[6] Pl.'s Mot. Protective Inj. at 3.

2. Legal Standard

*a. Preliminary Injunction*

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To establish entitlement to preliminary injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits, (2) that

[5] Plaintiff's motions are not paginated. Citations to those filings therefore refer to the page numbers assigned by the Court's electronic case filing system.

[6] Ms. Perez filed this motion against both KIPP DC and Capital City Public Charter School, Inc. ("Capital City"). Capital City responded, noting that KIPP DC filed its motion for a preliminary injunction only on behalf of itself, and not on behalf of Capital City. As such, Capital City claims that Ms. Perez's inclusion of Capital City in her motion was improper. Capital City Resp. Pl.'s Mot. Protective Inj. at 1–2, ECF No. 124. The Court agrees. To the extent that Ms. Perez's motion for a protective injunction includes Capital City, the Court also denies it.

it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. Eng.*, 454 F.3d 290, 297 (D.C. Cir. 2006). The Supreme Court has made clear that "[t]he default rule is that a plaintiff seeking a preliminary injunction must make a clear showing" as to each element. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). Nevertheless, "[t]he first two factors," likelihood of success on the merits and irreparable harm, "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

*b. Rule 11*

Federal Rule of Civil Procedure 11 allows the court to sanction a party for advancing an argument that is frivolous, baseless, legally untenable, brought with intent to vexatiously multiply the proceedings, or presented for any other improper purpose. Fed. R. Civ. P. 11 (b)(1)–(4), (c); *Cobell v. Norton*, 157 F. Supp. 2d 82, 86 n.8 (D.D.C. 2001). Rule 11 is intended to "discourage . . . abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed. R. Civ. P. 11 advisory committee's notes to 1983 amendment. It is within the Court's discretion to impose Rule 11 sanctions if an objective, "reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C. Cir. 1985).

"[T]he imposition of Rule 11 sanctions is not something courts take lightly; instead, Rule 11 sanctions are an extreme punishment for filing pleadings that frustrate judicial proceedings." *Intelsat USA Sales LLC v. Juch–Tech, Inc.*, 305 F.R.D. 3, 6 (D.D.C. 2014). Justifying sanctions

requires "clear and convincing evidence . . . of the predicate misconduct" and "of bad faith." *Pinson v. United States Dep't of Just.*, 273 F. Supp. 3d 1, 13 (D.D.C. 2017) (quoting *3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50, 53–54 (D.D.C. 2016)).

3. Analysis

KIPP DC's principal claim is that Ms. Perez threatened and intimidated its potential witnesses, including Ms. Schaeffler. KIPP DC's Mot. Prelim. Inj. at 6–7. As a remedy, it seeks an order preventing Ms. Perez from communicating directly with KIPP DC's represented parties and witnesses and instead requiring that she communicate with them solely through KIPP DC's counsel. *Id.* at 1. For the reasons explained below, KIPP DC has satisfied the conditions justifying a preliminary injunction. However, the Court grants KIPP DC's motion only in part so as not to let the injunction sweep too broadly. Specifically, the Court prohibits Ms. Perez from directly contacting only Ms. Schaeffler and otherwise simply from engaging in harassing or threatening communications with any other KIPP DC personnel.

*a. KIPP DC's Request for a Preliminary Injunction*

Federal courts are vested with the inherent power to manage their own proceedings and to control the conduct of those who appear before them. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991). "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Id.* at 43 (quoting *Anderson v. Dunn*, 19 U.S. 204, 227 (1821)). This power includes the ability to regulate litigants' behavior, particularly when such behavior includes harassing or intimidating communications. *Yates v. Belli Deli*, No. C 07-01405 WHA, 2007 WL 2318923, at *3 (N.D. Cal. Aug. 13, 2007) ("[A] district court has the inherent power to issue an injunction against litigants who harass their opponents."); *Palmer v. Milnor*, No. 19-

0961-LK, 2022 WL 407389, at *6–7 (W.D. Wash. Feb. 10, 2022), *aff'd*, 22-35214, 2023 WL 6458652 (9th Cir. Oct. 4, 2023) (prohibiting *pro se* plaintiff from communicating directly with named defendants after plaintiff threatened to "beat [him] up" and stated that he was "coming for" him); *Murphy v. Wilhelm*, No. 3:19-CV-01733- AC, 2021 WL 799307, at *2–4 (D. Or. Mar. 2, 2021) (ordering that plaintiff communicate only with opposing parties' counsel after finding plaintiff's repeated emails to be "accusatory, sometimes threatening, and always couched in an inappropriate and unprofessional tone"); *Clark v. Wells Fargo Bank*, No. 6:20-CV-00253-AA, 2020 WL 2301312, at *1 (D. Or. May 8, 2020) (prohibiting plaintiff from communicating directly with defendant parties after finding that "plaintiff's communications have been vexatious and disruptive to this litigation and to the work of defendants and those not involved in this case").[7]

Although the Court has "inherent authority to . . . prevent a *pro se* litigant from communicating with a represented party," *Murphy*, 2021 WL 799307, at *3, it must also consider Ms. Perez's First Amendment protections in considering the extent of any restrictions imposed on her ability to communicate with represented parties. The First Amendment generally prevents government actors, including courts, "from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (internal citations omitted). These protections for speech are especially strong with

[7] American Bar Association Model Rule of Professional Conduct 4.2 is also instructive. The rule states: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Courts in some jurisdictions have extended this rule even to *pro se* litigants. *See e.g. Pistolis v. Ameren*, No. 3:19 -CV-001185-MAB, 2022 WL 2159291, at *8 (S.D. Ill. June 15, 2022); *Clark*, 2020 WL 3038072, at *4 (sanctioning plaintiff for violating court order prohibiting him from directly contacting represented defendants in the case).

regard to prior restraints, or "judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, 4–14 (1984)). However, "[c]ourts have made a distinction between communication and harassment," the latter of which can be enjoined without running afoul of constitutional protections. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005). Where "restrictions based upon conduct . . . incidentally restrict speech," such restrictions have been found to "pose[ ] only a minimal burden on speech." *Id.* Accordingly, "courts do have the power to enjoin harassing communication." *Id.*; *see also United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (citation modified) (rejecting defendant's argument that his speech was protected when he "engaged in a course of conduct with the intent . . . to harass, or intimidate, or cause substantial emotional distress to [the victim]" by sending threatening text messages, designing a false Facebook page, and sending emails to the victim's coworkers containing nude photographs of the victim); *Myart v. Taylor*, No. SA: 5:16-CV-736-DAE, 2016 WL 5376227, at *4–6 (W.D. Tex. Sept. 26, 2016) (enjoining plaintiff from contacting, threatening, or harassing defendants for the pendency of the suit).

Having set forth the basis for its power to restrict litigants' harassing speech, the Court proceeds to analyze KIPP DC's request for a preliminary injunction under the traditional factors. The Court finds that the balance of the four factors supports granting KIPP DC's request for a preliminary injunction in part, as set forth below.

First, KIPP DC has shown a likelihood of success on the merits of its claim that Ms. Perez's communications constitute harassment, at least with respect to Ms. Schaeffler. Specifically, Ms. Perez's text messages to Ms. Schaeffler—including her insults and use of a

slang term indicating that she would fight Ms. Schaeffler during their next encounter—crossed the line from civil communications to harassment. As a result of these communications, Schaeffler has expressed concern for her personal safety. KIPP DC's Mot. Prelim. Inj. at 5. This concern is reasonable. *Cf. Beyond Blond Prods., LLC v. Heldman*, No. CV205581DSFGJSX, 2022 WL 2784404, at *5 (C.D. Cal. June 17, 2022) (finding that the defendant's "harassing and threatening emails" and use of personal insults against the plaintiff would cause a reasonable person to suffer substantial emotional distress). The text messages thus constitute reliable evidence to support KIPP DC's contention that Ms. Perez threatened Ms. Schaeffler, and because such communications are not protected First Amendment speech, they fall within the Court's power to restrict. *Osinger*, 753 F.3d at 945.

Second, KIPP DC has shown that it would suffer irreparable harm if the injunction were not granted. To demonstrate irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation modified). The Court agrees with KIPP DC that the concern Ms. Schaeffler has for her personal safety as a result of Ms. Perez's communications constitutes irreparable harm. KIPP DC's Mot. Prelim. Inj. at 8. Although some of Ms. Perez's conduct—such as protesting outside KIPP DC campuses and posting her opinions on her own Instagram—does not constitute unlawful harassment, the escalation to threatening text messages does. *Cf. United Artists Corp. v. United Artist Studios LLC*, No. CV 19-828-MWF (MAAx), 2019 WL 6917918, at *11 (C.D. Cal. Oct. 17, 2019) (finding that plaintiff demonstrated that irreparable injury is likely and imminent because defendant's "behavior has escalated over time, and he has threatened future harassment"). Ms. Perez failed to change her behavior after receiving KIPP DC's cease-and-desist letter. In fact, she sent multiple text messages to Ms. Schaeffler following the issuance of

the letter, ultimately culminating in the threat of violence. KIPP DC's Mot. Prelim. Inj. at 3–4; KIPP DC's Reply in Supp. Mot. Prelim. Inj. at Ex. C, ECF No. 131-3. The record thus demonstrates that the potential for future harm is actual.

Intimidating or threatening communications that make a witness fear for their safety may dissuade them or others from fully participating in a lawsuit. *See United Artists Corp.*, 2019 WL 6917918, at *11. Ms. Schaeffler has expressed such a fear, and the Court is thus inclined to take action to prevent a scenario that would negatively impact KIPP DC's ability to litigate this case or that could cause irreparable harm to its interests.[8] *Beyond Blond*, 2022 WL 2784404, at *6 (finding plaintiff was likely to suffer irreparable harm because defendant's "threatening and harassing emails increased in frequency over the pendency of this lawsuit, and may prevent [plaintiff's counsel and officer] from participating fully in this lawsuit or may interfere with their attorney-client relationship").

Third, a modified preliminary junction—prohibiting Ms. Perez from communicating directly with Ms. Schaeffler and from engaging in harassing or threatening communications with KIPP DC personnel and potential witnesses—does not substantially injure Ms. Perez. The Court is mindful that where an injunction's "scope and meaning are unclear," the concern over prohibiting speech is heightened. *Watson v. McGuire*, No. 15-cv-1043, 2016 WL 7839114, at *3 (D.D.C. June 2, 2016) (quoting *Metro. Opera Ass'n, Inc. v. Local 100*, 239 F.3d 172, 176 (2d Cir. 2001). Here, KIPP DC's initial request that the Court prohibit all of Ms. Perez's communications with KIPP DC personnel goes too far. *See Test Masters*, 428 F.3d at 580

[8] Although the Court is granting KIPP DC's motion for summary judgment as to all claims, the possibility that this action will remain pending through an appeal warrants the imposition of a modified preliminary injunction addressing Ms. Perez's ability to communicate with Ms. Schaeffler and other potential KIPP DC witnesses.

(finding that the district court's order "swept too broadly when it prohibited all communication" between defendant and plaintiff and plaintiff's employees); *Rissman, Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.*, CIV.A. 11-10791-MLW, 2011 WL 5025206, at *7 (D. Mass. Oct. 20, 2011) (rejecting proposed restriction on plaintiff's communication with other witnesses absent evidence of his attempt to contact them); *see also LaRue v. Johnson*, No. CV 16-00504 (EGS/RMM), 2018 WL 1967128, at *11 (D.D.C. Feb. 22, 2018), *report and recommendation adopted*, No. CV 16-504 (EGS), 2018 WL 2561036 (D.D.C. Apr. 4, 2018) (finding that injunction barring defendant from engaging in any contact and communication with plaintiff was "too broad" and "[sought] to enjoin communications that [had] not yet been found defamatory").

However, a preliminary injunction prohibiting harassment and intimidation toward KIPP DC personnel and potential witnesses is justified. *See Beyond Blond*, 2022 WL 2784404, at *6 (specifically prohibiting defendant from making "*threatening and harassing*" communications aimed at plaintiff and related personnel (emphasis added)); *Test Masters*, 428 F.3d at 580 (highlighting distinction between prohibiting defendant from "generally communicating" with plaintiff and prohibiting him from "threatening or harassing" plaintiff, finding the former too restrictive). Furthermore, an order prohibiting Ms. Perez from making any direct communication, threatening or not, toward Ms. Schaeffler specifically is also justified. *See Murphy*, 2021 WL 799307, at *3 (granting order that plaintiff not directly communicate with any party that is represented by counsel following ample evidence of plaintiff's harassment and intimidation); *Palmer*, 2022 WL 407389, at *7 (allowing prohibition on *pro se* plaintiff's communication with individually-named defendants following evidence of plaintiff's threatening conduct). Because KIPP DC provided sufficient evidence that Ms. Perez previously threatened Ms. Schaeffler, such a blanket restriction is warranted.

To be clear, the Court's order granting in part KIPP DC's request for a preliminary injunction does not bar all of Ms. Perez's communication or speech with KIPP DC personnel, but only her direct contact with Ms. Schaeffler and any harassing or intimidating contact with KIPP DC personnel and potential witnesses. By specifying to whom the restriction applies and the type of communication that is prohibited, this order avoids sweeping in restrictions on communications with unrelated persons, which could threaten Ms. Perez's protected speech. *See Rissman*, 2011 WL 5025206, at *7 (narrowing no-contact order to specific individuals whom plaintiff had previously threatened). Furthermore, Ms. Perez is still free to communicate with opposing counsel, which the Court recognizes as necessary to allow her to continue pursuing her claims. *Myart*, 2016 WL 5376227, at *5 (noting that "[i]mportantly, enjoining [plaintiff] from harassing the Defendants named in this lawsuit does not prevent him from effectively prosecuting this case [or] communicating with Defense counsel"). Ms. Perez is likewise not prevented from voicing her opinions about the school and its personnel in other contexts; she just may not do so in a manner that constitutes personal harassment. *See Myart*, 2016 WL 5376227, at *5 ("[A]n injunction does not prevent Mr. Myart from expressing his views about the named Defendants, so long as he does so in a manner that does not constitute personal harassment.").

Fourth, a preliminary injunction would be in the public interest because it would help ensure the fair administration of justice. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). The order contemplated here protects KIPP DC personnel and potential witnesses so that they can fully participate in this lawsuit without fear of receiving harassing communications from Ms. Perez.

*See Beyond Blond*, 2022 WL 2784404, at *6. Therefore, the balance of equities also tips in favor of granting KIPP DC's preliminary injunction request in part.

*b. Ms. Perez's Request for a Protective Injunction*

Ms. Perez asks this Court to enter a "protective injunction" forbidding KIPP DC from "filing preliminary injunctions or similar motions aimed at penalizing or chilling Plaintiff's exercise of her constitutional rights." Pl.'s Mot. Protective Inj. at 3. She argues that she requires the Court's intervention because KIPP DC is using its motion as a tool to harass, cause unnecessary delay, and needlessly increase the cost of litigation, in violation of Federal Rule of Civil Procedure 11(b)(1). *Id.* at 2–3. She also argues that KIPP DC seeks to chill her First Amendment right to peacefully protest. *Id.* at 3. Finally, she contends that absent Court action, KIPP DC will continue to use the litigation process as a means of intimidation. *Id.* For several reasons, the Court denies Ms. Perez's request.

First, Ms. Perez misreads KIPP DC's motion. As discussed, KIPP DC narrowly requests that Ms. Perez cease communication directly with represented parties. KIPP DC's Mot. Prelim. Inj. at 1. It does not seek to prevent her from protesting on public property or voicing her opinions through other media. Nor could it. *See McCullen v. Coakley*, 573 U.S. 464, 476 (2014) ("[T]raditional public fora are areas that have historically been open to the public for speech activities."); *see also Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) ("[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity . . . .").

Second, Ms. Perez's request that the Court restrict KIPP DC's ability to file motions for preliminary injunction is unjustified. Undoubtedly, federal courts "may employ injunctive remedies"—such as filing restrictions—"to protect the integrity of courts and the orderly and

expeditious administration of justice." *Smith v. Scalia*, 44 F. Supp. 3d 28, 46 (D.D.C. 2014) (quoting *Urb. v. United Nations*, 768 F.2d 1497, 1500 (D.C. Cir. 1985)), *aff'd*, No. 14-5180, 2015 WL 13710107 (D.C. Cir. Jan. 14, 2015). However, such action is not necessary or proper here. KIPP DC has not demonstrated that it intends to abuse the judicial system by making repeated harassing or frivolous filings. *See Procup v. Strickland*, 792 F.2d 1069, 1074 (11th Cir. 1986) (discussing the court's authority to enter injunctive relief against a "*recalcitrant* litigant" (emphasis added)).

Similarly, the Court does not find that KIPP DC's motion for a preliminary injunction is a violation of Rule 11. Ms. Perez has not presented any evidence that KIPP DC filed its motion for "any improper purpose" or that its filing is legally or factually untenable or sufficiently frivolous to warrant sanctions. *See Pinson*, 273 F. Supp. 3d at 13–14 (denying sanctions because plaintiff "has presented no evidence of bad faith, much less clear and convincing evidence"); *see also Gonzalez Ramos v. ADR Vantage, Inc.*, No. 21-CV-00592 (APM), 2022 WL 834095, at *2 (D.D.C. Mar. 21, 2022) (finding that "conclusory statements" are "unpersuasive" to substantiate a claim for sanctions); *Robertson v. McCloskey*, No. CIV. A. 86-2877, 1988 WL 90115, at *3 (D.D.C. Aug. 5, 1988) (merely labeling defendant's motion as "frivolous and harassing," without further explanation, is insufficient to warrant sanctions). Accordingly, there is no reason for the Court to believe that KIPP DC is filing frivolous or vexatious motions. Sanctions pursuant to Rule 11 must therefore be denied.

### B. Ms. Perez's Motions to Impose Sanctions on Defendants and to Re-Depose Susan Schaeffler (ECF Nos. 102, 106); Ms. Perez's Motion to Impose Sanctions on Defendants and to Re-Depose Karen Dresden (ECF No. 103); Ms. Perez's Motion to Compel a Psychological Examination of Susan Schaeffler (ECF No. 113)

While proceeding *pro se*, Ms. Perez petitioned the Court for several forms of relief against Defendants based on allegedly perjured testimony given by former KIPP DC President and CEO Susan Schaeffler and allegedly incomplete testimony given by former Head of School of Capital City Karen Dresden. First, she requests that the Court enjoin Defendants from relying on such testimony, strike the testimony from the record, permit her to re-depose Ms. Schaeffler and Ms. Dresden, refer the matters to the Department of Justice for investigation, and impose additional sanctions on Defendants as appropriate. *See* Pl.'s Mot. for Prelim. Inj. and Sanctions Based on Perjured Test. of Witness Susan Schaeffler ("Pl.'s 1st Schaeffler Mot.") at 3, ECF No. 102; Pl.'s Mot. for Inj., Sanctions, and Redeposition of Karen Dresden ("Pl.'s Dresden Mot.") at 2–3, ECF No. 103; Pl.'s Mot. for Inj., Sanctions, and Redeposition of Susan Schaeffler ("Pl.'s 2d Schaeffler Mot.") at 3, ECF No. 106. Second, she asks the Court to compel Ms. Schaeffler to undergo a psychological examination under Federal Rule of Civil Procedure 35. *See* Pl.'s Mot. for Psych. Eval. Susan Schaeffler ("Pl.'s Rule 35 Mot.") at 2, ECF No. 113. For the reasons below, the Court denies Ms. Perez's motions.[9]

[9] While still represented by prior counsel, Ms. Perez also filed a *pro se* motion to "compel unsealing or public filing of deposition transcripts" concerning Ms. Schaeffler. *See* Pl.'s Mot. Compel Unsealing or Public Filing of Dep. Trs., ECF No. 97. However, as Ms. Perez herself notes, "[n]o protective order has been publicly identified." *Id.* at 2. Portions of Ms. Schaeffler's transcripts have been previously filed publicly on the docket, *see, e.g.*, ECF No. 86-2, and the Court is not under the impression that Ms. Perez has been denied access to the transcripts. This motion is therefore denied.

1. Background

While still represented by former counsel, Ms. Perez deposed Ms. Schaeffler over two days on November 25, 2024, and December 11, 2024. She also deposed Ms. Dresden on December 9, 2024. Ms. Perez's counsel noted no objections during these depositions. *See* Defs.' Joint Opp'n to Pl.'s Mot. Inj., Sanctions, and Redeposition of Susan Schaeffler at 2, ECF No. 137; Capital City's Opp'n to Pl.'s Mot. Inj., Sanctions, and Redeposition of Karen Dresden ("Capital City's Opp'n to Pl.'s Dresden Mot.") at 1, ECF No. 122. Discovery continued for the next four months, with deadlines extended twice upon the parties' requests, before closing on March 19, 2025. *See id.*; Mar. 3, 2025, Minute Order.

2. Analysis

*a. Sanctions*

Ms. Perez asks the Court to impose sanctions pursuant to Federal Rules of Civil Procedure 11, 26, 30, and 37 on Defendants for the allegedly perjured or incomplete testimony provided by witnesses Susan Schaeffler and Karen Dresden. According to Ms. Perez, Ms. Schaeffler committed perjury by "den[ying] knowledge of Plaintiff's living arrangements, minimiz[ing] her awareness of the Coleman situation, and attempt[ing] to shift knowledge to speculation by others." Pl.'s 2d Schaeffler Mot. at 4. Ms. Perez alleges that she has "contemporaneous emails, testimony, and witness corroboration" that directly contradict eight of Ms. Schaffler's answers in her depositions. *Id.* This evidence is not attached to her motion. As for Ms. Dresden, Ms. Perez alleges that she "failed to disclose or address facts concerning the January 2009 visit of then-President Barack Obama to Capital City" during her deposition, which is "highly material to Plaintiff's claims" because Ms. Perez was "unlawfully restrained" at Coleman's house at the time. Pl.'s Dresden Mot. at 2.

The Court declines to impose sanctions on Defendants based on the testimony provided by Ms. Schaeffler and Ms. Dresden. Ms. Perez's motions fail at the threshold because she has not substantiated her claims that these witnesses rendered false or incomplete testimony. With respect to Ms. Schaeffler, the Court is unable to test Ms. Perez's assertions that this witness's statements are "directly contradict[ed]" by "contemporaneous emails, testimony, and witness corroboration" because Ms. Perez did not attach such evidence to her motion. Pl.'s 2d Schaeffler Mot. at 4. And with respect to Ms. Dresden, Ms. Perez does not explain or provide evidence showing how the testimony that Ms. Dresden omitted is "highly material" to her claims. Pl.'s Dresden Mot. at 2. Furthermore, Ms. Perez fails to identify a deposition question to which the omitted testimony would have been responsive. *Id.*

In any event, the Federal Rules of Civil Procedure do not authorize the imposition of penalties where, without proof of bad faith, a party simply disputes the veracity of deposition testimony given by a witness. Rule 11(b)(3) provides for sanctions if an attorney or unrepresented party presents "a pleading, written motion, or other paper" to the Court whose "factual contentions" lack evidentiary support. Fed. R. Civ. P. 11(b)(3). But "[t]his rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through Rule 37." Fed. R. Civ. P. 11(d). Depositions, which are governed by Rules 30 through 32, therefore fall outside of Rule 11's ambit. Nor are sanctions warranted under Rules 26 or 37. Rule 26(g) requires "[e]very disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection" to be signed by an attorney or unrepresented party certifying that the disclosure is "complete and correct" and the discovery request, response, or objection is legally warranted, not interposed for an improper purpose, and not unreasonable or

unduly burdensome or expensive. Fed. R. Civ. P. 26(g). But deposition testimony is neither a disclosure nor a discovery request, response, or objection.

Rule 30(d)(2), meanwhile, allows the court to impose a sanction on a person whose conduct is "so egregious" that it "impedes, delays, or frustrates the fair examination of the deponent." *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 185 (E.D. Pa. 2008) (quoting Fed. R. Civ. P. 30(d)(2)). Courts have found violations of Rule 30(d)(2) where, for example, a deponent "refused to answer most of the substantive questions posed to him" and "[i]nstead read nonresponsive statements verbatim from pre-prepared notes," *Doe I v. Exxon Mobil Corp.*, 539 F. Supp. 3d 59, 64 (D.D.C. 2021), or a deponent "improperly interpos[ed] his own objections" and "delayed the proceedings by providing unnecessarily protracted answers and repeatedly interrupting counsel," *GMAC Bank*, 248 F.R.D. at 187. Here, although Ms. Perez claims that Ms. Schaeffler and Ms. Dresden provided false or incomplete testimony, she does not allege that either witness or any other person engaged in similarly "egregious" conduct that impeded, delayed, or frustrated the depositions.

Finally, Rule 37(a)(3)(B)(i) allows a party to move for an order compelling an answer if a deponent fails to answer a question, and Rule 37(b) allows for sanctions if a deponent fails to obey such an order to answer a question or to provide or permit discovery. Fed. R. Civ. P. 37(a)(3)(B)(i), (b)(1)–(2). But Ms. Perez does not allege that Ms. Schaeffler or Ms. Dresden violated a court order. *See Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) (holding that Rule 37(b) is not triggered without a court order).

*b. Preliminary Injunction*

Ms. Perez also requests that the Court enjoin Defendants from relying on Ms. Schaeffler's and Ms. Dresden's perjured or incomplete testimony. "A preliminary injunction is

an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (citation modified). Here, however, Ms. Perez does not explain how the factors for granting a preliminary injunction weigh in her favor. As discussed, she does not even provide evidence showing how Ms. Schaeffler's testimony is contradicted by the record, and she does not adequately explain how Ms. Dresden's omitted testimony is material to her claims or identify a deposition question to which such testimony would have been responsive. Thus, at minimum, the Court finds that Ms. Perez has failed to show a likelihood of success on the merits, which defeats her motion for a preliminary injunction. *See E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 19-cv-657 (RC), 2020 WL 7264048, at *2 (D.D.C. Dec. 10, 2020).

*c. Psychological Examination*

Rule 35 provides that courts "may order a party" whose mental or physical condition is in controversy, or "a person who is in [the] custody or under [the] legal control" of a party, to submit to a medical examination. Fed. R. Civ. P. 35(a)(1). However, Rule 35 does not confer upon courts the ability to order an examination of current or former *employees* of a party. *See* Advisory Committee's Note to 1970 Amendment to Fed. R. Civ. P. 35 (noting that the relevant amendment "makes no reference to employees of a party"); *Smith v. Vestavia Hills Bd. of Educ.*, 218 F. Supp. 3d 1285, 1296 n.3 (N.D. Ala. 2016) (noting that Rule 35 does not apply to employees of a party); *Lewis v. Herrman's Excavating, Inc.*, 200 F.R.D. 657, 661 (D. Kan. 2001) (same). Here, Ms. Schaeffler was dismissed as a party to the suit on May 14, 2021. *See* Notice of Voluntary Dismissal at 1, ECF No. 5. The Court must therefore deny Ms. Perez's request for the Court to order a psychological examination of Ms. Schaeffler.

*d. Reopening Discovery*

Ms. Perez finally requests that she be permitted to re-depose Ms. Schaeffler and Ms. Dresden. "Federal Rule of Civil Procedure 16(b)(4) allows a court to modify a pretrial scheduling order, including by reopening discovery after it has concluded, only for good cause." *Colella v. Androus*, No. CV 20-813 (RC), 2025 WL 1492788, at *2 (D.D.C. Jan. 24, 2025). In analyzing whether to reopen discovery, the Court may consider

> (1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability of the need for additional discovery in light of the time allotted by the district court; and (6) the likelihood that discovery will lead to relevant evidence.

*Childers v. Slater*, 197 F.R.D. 185, 188 (D.D.C. 2000). In its analysis, "the Court primarily considers the diligence of the party in seeking the amendment." *Barnes v. District of Columbia*, 289 F.R.D. 1, 7 (D.D.C. 2012).

The Court declines to reopen discovery to permit redepositions of Ms. Schaeffler and Ms. Dresden. Discovery closed in March 2025. Ms. Perez does not explain why "the requested discovery she now seeks could not have been pursued earlier." *Abbott v. Finlayson*, No. 22-cv-2717 (BAH), 2024 WL 4957215, at *2 (D.D.C. Dec. 3, 2024). As Defendants point out, Ms. Schaeffler was identified as a potential witness at the start of litigation. Defs.' Joint Opp'n to Pl.'s Mot. Inj., Sanctions, and Redeposition of Susan Schaeffler at 8–9. Furthermore, permitting Ms. Perez to re-depose Ms. Schaeffler and Ms. Dresden would prejudice Defendants by forcing them "to address new evidence after the summary judgment stage" and months after discovery closed. *Colella*, 2025 WL 1492788 at *3. Finally, Ms. Perez's decision to terminate her prior counsel does not justify reopening discovery. Having chosen her prior counsel and "agreed to have counsel act as [her] agent before the Court," Ms. Perez was "bound by counsel's

representations and actions," and allowing her "to restart the litigation at this stage because [her] choice of counsel went awry would unduly prejudice defendants and interfere with the timely and efficient administration of justice." *Nguyen v. Mercer Island Boys Basketball Booster Club*, No. 2:23-CV-00855-RSL, 2025 WL 372037, at *1 (W.D. Wash. Feb. 3, 2025). For all of these reasons, the Court cannot find good cause for reopening discovery.

**C. Ms. Perez's Motions for Leave to Amend Complaint (ECF Nos. 100, 132); Ms. Perez's Motions to Compel (ECF Nos. 146, 184); Ms. Perez's Motion to Reopen Limited Discovery (ECF No. 169)**

While proceeding *pro se*, Ms. Perez filed two motions to amend the operative First Amended Complaint ("FAC"). First, she requests leave to amend in order to "remove the demand of $75,000" in damages included in the FAC. Pl.'s 1st Mot. Amend at 2, ECF No. 100. She argues that this amount "does not accurately reflect the scope of harm in this case," which she alleges reaches the "millions of dollars." *Id.* She further claims that "Defendants' own insurance policy provides coverage in the amount of $29 million, demonstrating the true scale of liability and exposure in this matter." *Id.* Second, Ms. Perez moved to amend the FAC to add as new defendants Friendship Public Charter School ("Friendship PCS"), which Ms. Perez attended from September 2007 to February 2008, and the CEO of Friendship PCS Patricia Brantley. Pl.'s 2d Mot. Amend at 2, ECF No. 132.

Around the same time, Ms. Perez moved to compel Capital City to "produce its complete insurance polic[ies] and related coverage documents" pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iv). Pl.'s 1st Mot. Compel at 2, ECF No. 146. She then moved to reopen limited discovery, arguing that "Defendants' failure to disclose complete and accurate insurance information and defense arrangements . . . rendered the discovery record materially incomplete

and unreliable." Pl.'s Mot. Reopen Limited Disc. at 2, ECF No. 169. A few months later, she also moved to compel KIPP DC to produce all insurance policies required under Rule 26(a)(1)(A)(iv). Pl.'s 2d Mot. Compel at 1, ECF No. 184. For the reasons below, the Court denies Ms. Perez's motions to amend, her motions to compel, and her motion to reopen limited discovery.

1. Legal Standard

*a. Rules 15 and 16*

"While Rule 15(a) [of the Federal Rules of Civil Procedure] governs motions to amend pleadings filed within the time allotted by the scheduling order, Rule 16(b) governs motions to amend pleadings filed after the deadline provided by the scheduling order." *Lovely-Coley v. District of Columbia*, 255 F. Supp. 3d 1, 5 (D.D.C. 2017). Under Rule 15(a)(2), when a party moves to amend more than 21 days after serving a pleading, courts "should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 16, meanwhile, governs scheduling orders and other case management tools. Case law in this District "makes clear that once the court enters a scheduling order, that schedule can only be modified with the court's consent and with good cause shown." *Lovely-Coley*, 255 F. Supp. 3d at 5. This "good cause" standard is more stringent, with the primary consideration being the diligence of the moving party. *Id.* at 6. "The Court's inquiry must [therefore] focus on the reasons the [moving party] has given for his delay instead of the substance of the proposed amendment." *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 589 F. Supp. 2d 21, 23 (D.D.C. 2008).

*b. Rule 26*

Pursuant to Rule 26(a)(1)(A)(iv), a party must provide to the other parties "any insurance agreement under which an insurance business may be liable to satisfy all or party of a possible

judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment." Fed. R. Civ. P. 26(a)(1)(A)(iv). Additionally, a party must make its initial disclosures based on the information "then reasonably available to it." Fed. R. Civ. P. 26(a)(1)(E). Rule 16(b)(4) permits modification of a scheduling order governing discovery "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Courts in this District have found that a party does not establish good cause if it shows a "lack of diligence during the allowed time period" for discovery. *Secord v. Cockburn*, 747 F. Supp. 779, 786 (D.D.C.1990) ("[W]here a party fails to pursue discovery in the face of a court-ordered cutoff, as here, that party may not be heard to plead prejudice resulting from his own inaction.") (citation omitted).

2. Analysis

*a. First Motion to Amend*

Ms. Perez's first motion to amend the FAC—to "remove the demand of $75,000"—is denied on futility grounds and for lack of good cause. A motion to amend a complaint under Rule 15(a)(2) may be denied "if such amendment would be futile," including because "it merely restates the same facts as the original complaint in different terms." *Greggs v. Autism Speaks, Inc.*, 987 F. Supp. 2d 51, 54 (D.D.C. 2014) (quoting *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002)). Here, the FAC requests "damages to be proven at trial *in excess* of the jurisdictional amount of $75,000," FAC at 24, 29, 31, 34, 38, 40 (emphasis added), rather than a set amount of $75,000, as Ms. Perez appears to suggest. Ms. Perez seeks to amend the FAC because she alleges that the scope of harm in this case reaches the "millions of dollars." Pl.'s 1st Mot. Amend at 2. But Ms. Perez does not, at this point, propose a specific amount in

damages to replace the current demand, which, in any event, would not preclude Ms. Perez from seeking an amount greater than $75,000.[10]

Even if Ms. Perez's motion to amend were not futile, the Court would have to deny it for lack of good cause under Rule 16. On October 18, 2023, this Court entered a minute order setting the deadline to amend pleadings as December 1, 2023. *See* Oct. 18, 2023, Minute Order. Because Ms. Perez's motion to amend was filed after that deadline, Rule 16's "good cause" standard applies, which "focuses on . . . the reasons for [the amendment's] tardy submission." *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002). Here, Ms. Perez provides none. As KIPP DC notes, although Ms. Perez "claims that her proposed amendment relates to KIPP DC's insurance coverage, that information was disclosed many months ago while discovery was still pending." KIPP DC's Omnibus Opp'n to Pl.'s Mots. at 5, ECF No. 125.

*b. Motions to Compel and Motion to Reopen Limited Discovery*

In her motion to reopen limited discovery, Ms. Perez argues that Defendants failed to "disclose complete and accurate insurance information and defense arrangements," in violation of Rule 26. Pl.'s Mot. Reopen Limited Disc. at 2. To remedy this, she requests that the Court reopen discovery for limited purposes, including to re-depose Susan Schaeffler and conduct a Rule 30(b)(6) deposition regarding Defendants' insurance coverage, and that the Court order

[10] The Court is aware of a case in this District in which the court granted a plaintiff's request to amend a complaint's demand for damages where the original complaint requested "an amount in excess of $2,000,000" and the proposed amended complaint requested "an amount in excess of $10,000,000." *Anderson v. USAA Cas. Ins. Co.*, 218 F.R.D. 307, 310 n.4 (D.D.C. 2003). However, in *Anderson*, the plaintiff alleged that she "recently discovered additional facts which are . . . pertinent to [the] plaintiff's ability to redress all of her claim," including, presumably, her calculation of damages. *Id.* at 311. Here, in contrast, Ms. Perez's sole justification for increasing the amount of damages is that Defendants' (previously disclosed) insurance policies provide coverage in the millions of dollars, rather than new factual contentions that might change the calculation of damages. Thus, the Court sees no need for amendment.

Defendants to produce (1) "[a]ll insurance policies from 2003 to present that may provide coverage or defense," (2) "[i]dentification of all insurers funding or controlling [the] defense," (3) "[a]ll reservation-of-rights letters and coverage position correspondence," and (4) [a]ny agreements concerning defense funding or coordination." *Id.* at 6. Similarly, in her motions to compel Capital City and KIPP DC to produce complete insurance policies and coverage documents, she argues that the schools are required under Rule 26 to produce "full policy declarations and schedules," "endorsements, amendments, riders, and renewals," "reservation-of-rights letters and coverage correspondence," and "communications between Capital City, its insurer[s], and any broker or adjuster relating to potential coverage." Pl.'s 1st Mot. Compel at 2; *see also* Pl.'s 2d Mot. Compel at 2.

In response, KIPP DC notes that it "produc[ed] the declaration pages for all relevant policies" on November 21, 2024. *See* Defs.' Joint Opp'n to Pl.'s Mot. Reopen Limited Disc. at 2, ECF No. 173. Furthermore, although KIPP DC did not initially produce the policies themselves, as required under Rule 26, it represents that it has now done so. KIPP DC's Opp'n to Pl.'s 2d Mot. Compel at 3, ECF No. 186; *see also Garcia v. Techtronic Indus. N. Am., Inc.*, No. 2:13-CV-05884 (MCA), 2015 WL 1880544, at *4 (D.N.J. Apr. 22, 2015) (finding that "the production of merely the declaration pages is insufficient to satisfy Rule 26" because "[t]he Rule is clear on its face regarding insurance agreements as a whole: their disclosure is automatic."). As for Capital City, it represents that it produced "[a] copy of the declarations page and policy" on August 28, 2024. Defs.' Joint Opp'n to Pl.'s Mot. Reopen Limited Disc. at 3.

"The plain language of Rule 26(a)(1)(A)(iv) only requires disclosing insurance policies themselves and not other insurance-related documents or later agreements entered by the insured with the insurer." *Coe v. Cross-Lines Ret. Ctr., Inc.*, 342 F.R.D. 539, 544 (D. Kan. 2022). Rule

26 does not speak to "reservation-of-rights letters," "coverage position correspondence," [i]dentification of all insurers funding or controlling Defendants' defense," or "agreements concerning defense funding or coordination." Pl.'s Mot. Reopen Limited Disc. at 6; *see also Coe*, 342 F.R.D. at 544 (finding that reservation-of-rights letters are not subject to mandatory disclosure under Rule 26(a)(1)(A)(iv)). For this reason, the Court denies Ms. Perez's motions to compel Capital City and KIPP DC to produce additional insurance materials. Capital City and KIPP DC have represented that they produced their insurance policies to Ms. Perez, which is sufficient to satisfy their obligations under Rule 26.

Furthermore, the Court denies Ms. Perez's motion to reopen discovery to depose Ms. Schaeffler and Defendants Rule 30(b)(6) witnesses. After discovery has closed, it may be reopened only for "good cause." *Colella*, 2025 WL 1492788, at *2. In analyzing whether good cause exists, "the Court primarily considers the diligence of the party in seeking discovery before the deadline." *Id.* (quotation omitted). Ms. Perez does not explain her delay in seeking these depositions. Capital City produced its insurance policy months before its Rule 30(b)(6) deposition took place, so Ms. Perez could have asked about its insurance policies then. Defs.' Joint Opp'n to Pl.'s Mot. Reopen Limited Disc. at 5. KIPP DC also produced at least the declarations pages of its insurance policies before Ms. Schaeffler was deposed. *Id.* at 4. And Ms. Perez "never raised any issue with KIPP DC's production" while discovery was still ongoing. *Id.* at 3. Regardless, Ms. Perez does not explain how any of this insurance information would impact her ability to oppose Defendants' motions for summary judgment. The Court therefore finds that good cause is lacking to reopen discovery to permit Ms. Perez's requested depositions.

*c. Second Motion to Amend*

In her second motion to amend, Ms. Perez requests leave to add as defendants Friendship PCS and its CEO Patricia Brantley. Ms. Perez alleges that Friendship PCS and Ms. Brantley "played a direct role in the concealment of [her] kidnapping and unlawful enrollment" between September 2007 and February 2008. Pl.'s 2d Mot. Amend at 2. Specifically, once Ms. Perez had left KIPP DC and was living with Coleman outside of the District of Columbia, then CEO of KIPP DC Susan Schaeffler allegedly "pressured [Ms. Perez's] mother to enroll [her] at Friendship PCS." *Id.* Although Ms. Perez was no longer residing with her mother, "enrollment was pushed forward using a D.C. address." *Id.* at 3. Ms. Perez argues that her enrollment at Friendship PCS therefore "reduced scrutiny of the kidnapping and served to conceal the circumstances of Plaintiff's residency and victimization." *Id.*

As noted above, because Ms. Perez moved to amend the FAC after the Court's deadline to amend pleadings passed, she must satisfy Rule 16's "good cause" standard. The Court therefore "focuses on the reasons" given for the delay "instead of the substance of the proposed amendment." *Lurie*, 589 F. Supp. 2d at 23. Here, though, Ms. Perez provides no justification for modifying the Court's scheduling order at this late juncture. As Defendants observe, Ms. Perez has known of her proposed claims against Friendship PCS and Ms. Brantley since at least 2007. Defs.' Joint Omnibus Opp'n to Pl.'s 2d Mot. Amend at 6, ECF No. 144. Yet Ms. Perez did not seek to add these new parties when she amended her complaint in July of 2024 or prior to the Court's deadline. Furthermore, at this point, granting Ms. Perez's motion would require reopening discovery and unfairly delay resolution of Defendants' pending summary judgment motions. Therefore, because Ms. Perez has not shown good cause for amendment and because amendment would cause an undue delay, the Court denies her motion. *See Mowrer v. United*

*States Dep't of Transp.*, 14 F.4th 723, 732 (D.C. Cir. 2021) ("We have consistently held that undue delay is a valid ground for denying leave to amend.").

**D. Ms. Perez's Motion to Disqualify Gregory Marshall (ECF No. 133)**

Ms. Perez, proceeding *pro se*, moved to disqualify Gregory Marshall, one of the counsel for KIPP DC, because of his prior employment as an Assistant U.S. Attorney in the U.S. Attorney's Office of the District of Columbia ("USAO-DC") during the period in which Coleman was abusing Ms. Perez. Pl.'s Mot. Disqualify Gregory Marshall ("Pl.'s Mot. Disqualify") at 3, ECF No. 133. Ms. Perez argues that Mr. Marshall's prior employment creates a conflict of interest because USAO-DC bore responsibility for prosecuting the crimes Ms. Perez suffered but failed to do so. *Id.* She also alleges that Mr. Marshall has engaged in "ongoing retaliatory conduct toward" Ms. Perez. *Id.*

Although courts may disqualify counsel if there is a conflict of interest, disqualification is considered a "drastic measure that is disfavored by the courts." *Pressley v. Mgmt. Support Tech., Inc.*, No. 22-cv-2262 (RC), 2024 WL 5708170, at *2 (D.D.C. Oct. 21, 2024) (citation omitted). Accordingly, "disqualification motions should be subject to particularly strict judicial scrutiny." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135–36 (D.D.C. 2011). Strict scrutiny is warranted because disqualification "negates a client's right to freely choose his counsel," *Headfirst Baseball LLC v. Elwood*, 999 F. Supp. 2d 199, 204 (D.D.C. 2013) (citation modified), and because such motions may be "used as 'procedural weapons' to advance purely tactical purposes," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d 104, 110 (D.D.C. 2013) (citation omitted).

Ms. Perez's disqualification motion is without merit. First, as KIPP DC notes, Ms. Perez does not allege that Mr. Marshall had any involvement with any investigation related to the

allegations in her case while he was at USAO-DC. *See* KIPP DC's Opp'n to Pl.'s Mot. Disqualify at 3, ECF No. 143. Nor does she allege that Mr. Marshall ever became aware of these allegations during that time. In fact, Ms. Perez's abuse was not reported to the D.C. Metropolitan Police Department and thereafter to USAO-DC until 2016, by which time Mr. Marshall had already been in private practice for several years. *Id.* at 3–4. Second, Mr. Marshall has not engaged in "retaliatory conduct." Ms. Perez claims that Mr. Marshall harassed and intimidated her when, on behalf of KIPP DC, he sent her a cease-and-desist letter demanding that she stop making defamatory statements about Ms. Schaeffler. Pl.'s Mot. Disqualify at 4. However, as the Court explained above, KIPP DC was justified in its efforts to attempt to stop Ms. Perez from harassing Ms. Schaeffler. Ms. Perez's motion to disqualify Mr. Marshall is therefore denied.

**E. Defendants' Motions in Limine (ECF Nos. 84, 85, 88, 89)**

Once discovery concluded, KIPP DC and Capital City filed motions to limit or exclude as inadmissible certain opinions by Ms. Perez's standard-of-care expert, Billie-Jo Grant, and psychological expert, Melissa Blackwell. *See* KIPP DC's 1st Mot. in Limine; KIPP DC's 2d Mot. in Limine; Capital City's 1st Mot. in Limine; Capital City's 2d Mot. in Limine. To support her claims against KIPP DC and Capital City, Ms. Perez designated Dr. Grant, who holds a Doctorate in Educational Research, Statistics, and Evaluation, to serve as an expert witness regarding "the duties, responsibilities, obligations, and the standard of care owed by" KIPP DC and Capital City "in preventing and responding to the sexual abuse of children in their care, and supervising their staff and children." KIPP DC's 1st Mot. in Limine at Ex. A, Pl.'s Rule 26(a)(2) Expert Disclosures at 4–5, ECF No. 84-2. And to support her claims for emotional distress, Ms. Perez designated Dr. Blackwell, a licensed psychologist, to serve as an expert witness regarding

Ms. Perez's neuropsychological evaluation and condition. *Id.* at 3–4. Ms. Perez has declined to respond to Defendants' motions in limine, despite this Court's warning to her about the possible consequences of failing to respond. *See* July 22, 2026, Minute Order. Accordingly, the Court will grant the four motions in limine as conceded.

Federal Rule of Evidence 702 governs the admission of expert testimony. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "The Court serves as a gatekeeper for expert testimony," and "Rule 702 imposes a 'special obligation upon a trial judge' to ensure that expert testimony is not only relevant, but reliable." *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 408 (D.D.C. 2017) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Dr. Grant intends to testify that KIPP DC and Capital City violated a national standard of care applicable to schools in a negligence case, including by failing to effectively train their employees regarding sexual harassment, abuse prevention, and reporting requirements; failing to thoroughly investigate and report Coleman's suspicious and inappropriate behavior with Ms. Perez to the authorities; failing to adequately monitor or supervise Coleman; and failing to take corrective action to remediate this environment. KIPP DC's 1st Mot. in Limine at Ex. B, Dr. Grant's Expert Report at 6, ECF No. 84-3. Accordingly, Dr. Grant intends to testify that Ms.

Perez "was subjected to continued and ongoing abuse by Coleman because of the deliberate action and inaction" of KIPP DC and Capital City. *Id.* In their motions in limine, KIPP DC and Capital City argue that Dr. Grant's opinions should be excluded under Rule 702 for several reasons, including because Dr. Grant fails to utilize reliable principles and methods to articulate a national standard of care applicable to the schools, relies on unsupported factual assumptions, and provides improper legal conclusions. *See generally* KIPP DC's 1st Mot. in Limine; Capital City's 1st Mot. in Limine.

Dr. Blackwell, meanwhile, conducted a neuropsychological examination of Ms. Perez "to determine the current status of [her] symptoms and her continued needs," and she intends to testify that Ms. Perez's "psychological trauma has been exacerbated by her experiences of school staff taking no action to protect her from the abuse." KIPP DC's 2d Mot. in Limine at 4. Defendants argue that this opinion is unreliable and therefore inadmissible under Rule 702 because Dr. Blackwell formulated it by relying exclusively on statements Ms. Perez made to her, without independently analyzing the schools' conduct, and because Dr. Blackwell failed to consider other potential sources of Ms. Perez's psychological injuries, including her mother's and her high school's failure to protect her from Coleman's abuse. *See generally id.*; Capital City's 2d Mot. in Limine.

On July 22, 2026, the Court set a final briefing schedule on Defendants' motions in limine, ordering Ms. Perez to file her responses to these motions on or before August 13, 2026. The Court warned Ms. Perez—who had previously failed to abide by the Court's deadlines on these motions[11]—that "under Local Civil Rule 7(b), if a memorandum of points and authorities

[11] Months earlier, the Court had ordered Ms. Perez to confer with KIPP DC and Capital City to propose a briefing schedule on Defendants' motions in limine. *See* Jan. 26, 2026, Minute Orders. The Court then ordered Ms. Perez to file her response to KIPP DC's motions in limine

to a motion is not filed within the Court's prescribed time, the Court may treat the motion as conceded." July 22, 2026 Minute Order. Nevertheless, Ms. Perez failed to submit her responses. Because Ms. Perez had ample notice that the Court could treat her failure to respond as a concession of the motions, and because she has not offered the Court a compelling reason not to do so, the Court will grant Defendants' motions as conceded.

Given this concession, the opinions of Ms. Perez's experts regarding the applicable standard of care and the source of Ms. Perez's psychological injuries must be struck. The Court believes, furthermore, that such expert evidence is necessary for Ms. Perez to prove many, if not all, of her claims. A plaintiff asserting a negligence claim must prove both "the applicable standard of care" and "a deviation from that standard by the defendant." *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 841 (D.C. Cir. 2007). "When the standard of care in question arises from a particular occupational setting, and depends on knowledge of typical practices by professionals of that occupation, a plaintiff cannot establish a negligence claim without proffering expert testimony as to the standard of care particular to that occupational setting." *Prasad v. Geo. Wash. Univ.*, 390 F. Supp. 3d 1, 36 (D.D.C. 2019). Although "no expert testimony is needed if the subject matter is within the realm of common knowledge and everyday

---

by April 1, 2026, but Ms. Perez did not meet this deadline or request an extension. *See* Mar. 17, 2026, Minute Order. Then, on May 15, 2026, Ms. Perez filed a motion to hold Defendants' motions in limine in abeyance on the grounds that "the procedural and factual posture of this case has materially evolved" since the filing of the motions. Pl.'s Mt. Hold Pending Mots. in Abeyance at 3, ECF No. 190. The Court denied this motion, explaining that "the present procedural and factual posture of the case does not warrant delaying the resolution of the pending motions in limine." July 22, 2026, Minute Order. Nevertheless, Ms. Perez subsequently filed a second motion to hold Defendants' expert motions in abeyance. *See* ECF No. 194. A notice of error was docketed with respect to Ms. Perez's second motion because she failed to include the requisite signature. *See id.* But even if Ms. Perez had properly filed this second motion, the Court would deny it. Although the second motion was more detailed than the first, Ms. Perez requested essentially the same relief as in her first motion and for substantially the same reasons. *Compare* ECF No. 190, *with* ECF No. 194.

experience," it is "routinely required in negligence cases which," like here, "involve issues of safety, security and crime prevention." *Briggs*, 481 F.3d at 845–46 (citation modified).

Nevertheless, even if Ms. Perez had put forward expert evidence proving the proper standard of care for her gross negligence claims and a causal link between Defendants' actions and Ms. Perez's emotional distress for her intentional infliction of emotional distress claims, Defendants would still be entitled to summary judgment on all claims. As set forth in the section below, Ms. Perez has failed to contest Defendants' evidence showing that neither KIPP DC nor Capital City grossly breached any duties of care owed to Ms. Perez or that Defendants' actions did not constitute extreme and dangerous conduct causing Ms. Perez severe emotional distress, as she was required to do to defeat summary judgment.

### F. Defendants' Motions for Summary Judgment (ECF Nos. 86, 87)

Having resolved all of the non-dispositive motions, the Court finally considers Defendants' motions for summary judgment. As noted, Ms. Perez has asserted claims against KIPP DC and Capital City for gross negligence; grossly negligent hiring, supervision, and retention; and intentional infliction of emotional distress; and she has asserted a claim for premises liability against KIPP DC only. KIPP DC and Capital City move for summary judgment on all claims. *See* KIPP DC's Mot. Summ. J., ECF No. 86; Capital City's Mot. Summ. J., ECF No. 87. Ms. Perez opposes both parties' motions for summary judgment on the merits. *See* Pl.'s Opp'n to KIPP DC's Mot. Summ. J., ECF No. 170; Pl.'s Opp'n to Capital City's Mot. Summ. J., ECF No. 175. Alternatively, she argues that Defendants' motions for summary judgment are premature under Federal Rule of Civil Procedure 56(d). Below, the Court first addresses Ms. Perez's Rule 56(d) argument and, finding it without merit, proceeds to consider

the pending motions for summary judgment. For the reasons below, the Court grants summary judgment to KIPP DC and Capital City as to all claims.

1. Rule 56(d)

Under Rule 56(d), if the nonmoving party on a motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Ms. Perez argues that Defendants' motions for summary judgment are premature because (1) discovery was "incomplete and constrained," (2) "key evidence remains uniquely within Defendants' control," and (3) "[d]epositions taken late in discovery revealed new contradictions and factual disputes regarding notice, reporting, and supervision that could not reasonably have been anticipated earlier." Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 8; *see also* Pl.'s Opp'n to Capital City's Mot. Summ. J. at 6–7. She therefore asks the Court to defer consideration on the motions.

The purpose of Rule 56(d) is "to ensure that the non-moving party isn't railroaded by a premature motion for summary judgment." *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 880 F. Supp. 2d 36, 41 (D.D.C. 2012) (citation modified). "To obtain relief, a Rule 56(d) movant must: (1) 'outline the particular facts [the party defending against summary judgment] intends to discover and describe why those facts are necessary to the litigation'; (2) explain why the party could not produce those facts in opposition to the pending summary-judgment motion; and (3) 'show [that] the information is in fact discoverable.'" *Jeffries v. Barr*, 965 F.3d 843, 855 (D.C. Cir. 2020) (quoting *Convertino v. U.S. Dep't of Just.*, 684 F.3d 93, 99–100 (D.C. Cir. 2012)). In sum, a Rule 56(d) affidavit or declaration "cannot be a generalized, speculative request to

conduct discovery but must demonstrate," through application of the three *Convertino* factors, "that further specified discovery will defeat a summary judgment motion." *Est. of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010) (citation modified).

Ms. Perez's Rule 56(d) argument falls short on all three factors. First, she does not outline "particular facts" she seeks to discover or explain their relevance to the litigation. *Convertino*, 684 F.3d at 99. Instead, she asserts that "key evidence remains uniquely within Defendants' control," which she alleges includes "records concerning internal reporting, escalation decisions, communications with law enforcement, insurance coverage, and institutional responses to known risks." Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 8. But "even were [the Court] to construe the broad categories of information sought as constituting 'particular facts' under *Convertino*, [Ms. Perez] simply does not 'describe why those facts are necessary to the litigation.'" *Jeffries*, 965 F.3d at 856 (quoting *Convertino*, 684 F.3d at 99). Nor does she describe the alleged "new contradictions and factual disputes" revealed in discovery or explain how they relate to her claims. Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 8. Second, Ms. Perez does not explain why, over the nine months that the parties conducted discovery, she did not have "a full and fair opportunity to obtain discovery essential to opposing summary judgment," as she now claims. *Id.* Third, she has offered "only a conclusory assertion" that Defendants possess undisclosed information that could be unearthed with further discovery. *Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006). But Rule 56(d) "may not be used to defeat a motion for summary judgment when there is 'mere speculation' of evidence not yet discovered." *Morales v. Humphrey*, 309 F.R.D. 44, 48 (D.D.C. 2015) (quoting 11 Moore's Federal Practice ¶ 56.102 (3d ed.)).

Given Ms. Perez's *pro se* status, however, the Court will look beyond the Rule 56(d) argument presented in her responses to summary judgment to determine whether any of her previously filed discovery motions justify deferral of the Court's consideration of Defendants' motions for summary judgment. As detailed above, Ms. Perez filed several motions *pro se* to reopen discovery, which the Court has now denied. For the reasons explained in the Court's denials, and as further detailed below, none of those discovery motions entitle Ms. Perez to relief under Rule 56(d).

In her first set of discovery motions, Ms. Perez moved to re-depose former KIPP DC President and CEO Susan Schaeffler and former Head of School of Capital City Karen Dresden. *See* Pl.'s Dresden Mot.; Pl.'s 2d Schaeffler Mot. Ms. Perez argued that she should be allowed to re-depose Ms. Schaeffler because Ms. Schaeffler allegedly gave false testimony regarding her awareness of Ms. Perez's living arrangements with Coleman. Pl.'s 2d Schaeffler Mot. at 4. She further contended that she should be allowed to re-depose Ms. Dresden because Ms. Dresden allegedly failed to disclose facts concerning then President Barack Obama's visit to Capital City in 2009. Pl.'s Dresden Mot. at 2. However, Ms. Perez has not supported her conclusory claim against Ms. Schaeffler with evidence showing that Ms. Schaeffler's testimony was false. Nor has she clarified how facts related to President Obama's visit to Capital City are "necessary to the litigation." *Convertino*, 684 F.3d at 99. And perhaps most critically, Ms. Perez has not explained why she was unable to ask these witnesses the questions she now wants answered during their prior depositions. *See Berkeley v. Home Ins. Co*., 68 F.3d 1409, 1414 (D.C. Cir. 1995) ("Notwithstanding the usual generous approach toward granting [Rule 56(d)] motions, the rule is not properly invoked to relieve [a party's] lack of diligence."). Accordingly, Ms. Perez's "attempts to use Rule 56(d) discovery to undermine the credibility of [Ms. Schaeffler and Ms.

Dresden] are futile." *Mack v. Aspen of D.C., Inc.*, No. 15-cv-1973 (RJL), 2018 WL 564558, at *7 n.10 (D.D.C. Jan. 24, 2018).

More recently, Ms. Perez also filed a motion to reopen limited discovery to address Defendants' alleged "failure to disclose complete and accurate insurance information and defense arrangements." Pl.'s Mot. Reopen Limit Disc. at 2. Specifically, she seeks to obtain further information and conduct certain depositions relating to Defendants' "insurance agreements under which [they] may be liable to satisfy" a judgment in her favor. Fed. R. Civ. P. 26(a)(1)(A)(iv). However, Ms. Perez emphasizes that this information is relevant to the amount of damages she can recover. *See* Pl.'s 1st Mot. Amend at 2. To the extent she also claims it is "essential to justify [her] opposition" to the motions for summary judgment, she does not explain why this is the case. Fed. R. Civ. P. 56(d). Nor could she. Defendants' motions for summary judgment address liability. Even if the information Ms. Perez seeks were discoverable and created a factual dispute as to damages, this would not preclude the Court from granting or denying Defendants' motions for summary judgment as to liability.

2. Background

Having denied Ms. Perez's Rule 56(d) motion, the Court proceeds to consider Defendants' motions for summary judgment, starting with the relevant factual background. In her complaint, Ms. Perez alleges that she first encountered Coleman during the 2003–2004 school year, when he was her seventh-grade science teacher and drumline coach at KIPP DC. FAC ¶ 25. Coleman began "grooming [Ms. Perez] with gifts, favors, and offers of support and guidance" and "physically touching, hugging, and consoling and comforting [Ms. Perez]" at school. *Id.* ¶¶ 28, 30. Around this time, Ms. Perez's mother, Latisha Weir, took a job with the U.S. Postal Service, which required working longer hours. *Id.* ¶ 36. According to Ms. Perez,

Coleman then "began giving [her] rides to and from school in his personal vehicle." *Id.* ¶ 38. During the 2004–2005 school year, Coleman became Ms. Perez's eight-grade history teacher at KIPP DC, and "[a]t his urging, she also became his teacher's aide." *Id.* ¶¶ 44–45. In November of 2004, while Ms. Perez was fourteen years old, "Coleman took [Ms. Perez] on their 'first date,'" and shortly thereafter, he began sexually assaulting her. *Id.* ¶¶ 50–51.

In its motion for summary judgment, KIPP DC has produced evidence showing that the school hired Coleman in July of 2003, that Coleman was Ms. Perez teacher during the next two years, and that he was Ms. Perez's after-school drumline coach during the 2004–2005 school year. *See* KIPP DC's Mot. Summ. J. at Ex. B, Dep. of Susan Schaeffler ("Schaeffler Dep.") at 87:21–88:6, 119:18–120:2, 130:6–8, ECF No. 86-2; *id.* at Ex. G, Dep. of Shanique Perez ("Perez Dep.") at 43:1–17, ECF No. 86-7. KIPP DC stresses that while Coleman was employed there, KIPP DC's administration knew of only two occasions during which Coleman interacted with Ms. Perez after school hours.

First, KIPP DC's vice principal at the time, Sarah Hayes Campbell, testified that during the 2004–2005 school year, she became aware that Coleman had been driving Ms. Perez and another student after drumline practice either to their houses or to his house, from where their mothers would then pick them up. KIPP DC's Mot. Summ. J. at Ex. D, Dep. of Sarah Hayes Campbell ("Hayes Dep.") at 177:10–178:8, ECF No. 86-4. Upon learning this, Ms. Hayes "called both their moms," who "confirmed that [Coleman] had permission to give them rides home . . . on a regular basis." *Id.* at 181:9–16. In deposition testimony, Ms. Weir agreed that she gave Coleman permission to drive Ms. Perez home. KIPP DC's Mot. Summ. J. at Ex. F, Dep. of Latisha Weir ("KIPP DC's Mot. Summ. J. Weir Dep.") at 56:10–12, ECF No. 86-6. Ms. Hayes did not recall following up with Coleman after confirming that he had obtained parental

permission; she testified that she "wasn't worried about appropriate boundaries" and that "the expectation was that [teachers] could take kids home . . . but [they] always needed to have . . . parent permission." Hayes Dep. at 185:7–186:4.

Second, also during the 2004–2005 school year, Ms. Schaeffler learned from Ms. Perez that she had done an activity—"the movies or something"—with Coleman outside of school hours. Schaeffler Dep. at 133:11–134:14. Ms. Schaeffler "asked [Ms. Perez] if her mother knew, and she said yes." *Id.* at 133: 16–17. Ms. Schaeffler then called Ms. Weir, who confirmed that she was aware of the outing and, per Ms. Schaeffer, "appreciated that [she] called" and was "very pleased how helpful Ms. Coleman was." *Id.* at 134:3–5. Ms. Weir added in testimony that she trusted Coleman, took Ms. Perez to his house during several weekends, and gave him permission to take Ms. Perez to museums, movies, and meals. KIPP DC's Mot. Summ. J. Weir Dep. at 60:3–11, 61:15–18. Around the same time that Ms. Schaeffler called Ms. Weir, she also spoke to Coleman about the outing with Ms. Perez and told him that although she "appreciated [him] looking out for [Ms. Perez] and helping other kids," he could not do so "in a one-to-one capacity." Schaeffler Dep. at 162: 4–8. According to Ms. Schaeffler, Coleman indicated that he "agreed" and "understood" the school's policy. *Id.*

After the 2004–2005 school year, KIPP DC declined to renew Coleman's teaching contract, which had expired. Schaeffler Dep. at 143:19–144:7. According to Ms. Schaeffler, she did not renew his contract because Coleman "been a problem in the classroom all year." *Id.* at 163:15–16. Specifically, Coleman allowed students to engage in behavior that was inconsistent with KIPP DC's standards, including "put[ting] their feet on the desk," "us[ing] profanity," "pas[sing] out snacks during the middle of class," and "not making kids do homework." *Id.* at 144:1–7, 145:5–6. Ms. Schaeffler testified that KIPP DC's decision not to renew Coleman's

contract "was never because he had an appropriate relationship with [Ms. Perez], because that was not even known." *Id.* at 143:12–14. Despite not renewing Coleman's contract, KIPP DC allowed Coleman to continue teaching drumline during the summer of 2005. KIPP DC's Mot. Summ. J. at Ex. A, Dep. of Shannon Hodge ("Hodge Dep.") at 170:19–172:1, ECF No. 86-1.

In the summer of 2005, Coleman applied to and was hired by Capital City. Capital City's Mot. Summ. J. at Ex. N, ECF No. 87-16. Although Coleman asked Capital City not to contact Ms. Schaeffer, he provided as a reference the principal of another school that he had worked at previously, Miner Elementary. *Id.* at Ex. C, Dep. of Karen Dresden ("Dresden Dep.") at 132:4–133:14, ECF No. 87-5. Capital City's principal at the time, Ms. Dresden, interviewed Coleman. Ms. Dresden offered Coleman the position of sixth-grade teacher at Capital City. *Id.* at 150:10–12. Coleman continued teaching various grades at Capital City for several years thereafter. *Id.* at 150:16–153:10.

Meanwhile, in 2005, Ms. Perez finished her eighth-grade year at KIPP DC and began attending an all-girls private boarding school, the Madeira School, in McLean, Viriginia. FAC ¶ 59. Ms. Perez alleges that Coleman "would take her off campus on the weekends to his home in Maryland." *Id.* Ms. Weir testified that she had informed Madeira that Coleman was authorized to pick up Ms. Perez from the school. KIPP DC's Mot. Summ. J. Weir Dep. at 76:13–18. But in the spring of 2007, while Ms. Perez was attending Madeira, Ms. Weir found text messages between Ms. Perez and Coleman indicating that Coleman was behaving inappropriately toward Ms. Perez. Capital City's Mot. Summ. J. at Ex. H, Dep. of Latisha Weir ("Capital City's Mot. Summ. J. Weir Dep.") at 68:18–70:3, ECF No. 87-10. Ms. Weir believes she did not call the police at that point because she "was not sure" if Coleman and Ms. Perez

were having sexual activity. *Id.* at 72:11–73:2. Nevertheless, Ms. Weir asked Madeira to revoke Coleman's authorization to pick up Ms. Perez from the school. *Id.* at 76:7–9.

On March 22, 2007, Ms. Weir received an email from Ms. Perez's email account with a letter attached. *See* Capital City's Mot. Summ. J. at Ex. T, ECF No. 87-22. In that letter, Ms. Perez professed her love for Coleman and her intent to live with him. *Id.* She also stated: "We did not speak of any re[la]tionship beyond that of student and a teacher when I was at KIPP and I did not tell him how I felt until a few months ago . . . No laws have been broken." *Id.* After the spring semester ended, Ms. Perez lived with Ms. Weir, but during the summer of 2007, she left her mother's house and moved in with Coleman. Capital City's Mot. Summ. J. Weir Dep. at 89:6–91:8. At some point after Ms. Perez left, Ms. Weir contacted the police to report that her daughter had run away to be with Coleman. *Id.* at 92:4–93:12. Ms. Weir testified that the police told her that because Ms. Perez "was at the age of 16" and could "consent to be with whomever," there was "nothing that [Ms. Weir] could do." *Id.* at 92:17–22.

In August of 2007, Ms. Weir also emailed KIPP DC's then principal, Ms. Hayes, stating that she was "confident" that Ms. Perez was "living with Mr. Coleman." Hayes Dep. at 211:12–19, 214:14–18. In her email, Ms. Weir attached the March 2007 letter, along with other correspondence between Ms. Perez and her. After receiving Ms. Weir's email, Ms. Hayes shared it with Ms. Schaeffler, and the two then consulted a police officer who happened to be on KIPP DC's campus that day about the situation. Schaeffler Dep. at 175:2–8; Hayes Dep. at 215:17–216:2. According to both Ms. Hayes and Ms. Schaeffler, the police officer told them that because Ms. Perez was at the age of consent, there was nothing they could do. *Id.* Ms. Schaeffler later testified that Ms. Perez's correspondence to her mother made her realize that "something might be there" between Coleman and Ms. Perez. Schaeffler Dep. at 194:22–195:7.

In the fall of 2007, Ms. Weir traveled to Capital City's campus and requested to speak to Coleman's direct supervisor, who was David Philhower. Capital City's Mot. Summ. J. at Ex. A, Dep. of Anne Herr ("Herr Dep.") at 75:9–77:19, ECF No. 87-3. Mr. Philhower and Capital City's executive director, Anne Herr, met with Ms. Weir. *Id.* Ms. Weir testified that she stated during this meeting that her daughter, who was a minor, had left home to live with Coleman. Capital City's Mot. Summ. J. Weir Dep. at 158:16–159:8. Ms. Weir's aim in reaching out to Capital City was to get back Ms. Perez and to "[g]et[ ] [Coleman] away from other kids." *Id.* Ms. Herr recalls Ms. Weir explaining that Ms. Perez had been a student of Coleman's at KIPP DC and was now in an inappropriate relationship with her daughter and asking Capital City to fire Coleman. Herr Dep. at 79:18–81:4. Ms. Weir recounts being told that "there was nothing that [Capital City] could do." Capital City's Mot. Summ. J. Weir Dep. at 161:9–11.

Within a few days after her conversation with Ms. Weir, Ms. Herr interrogated Coleman about Ms. Weir's claims. Herr Dep. at 103:11–104:10. According to Ms. Herr, although Coleman agreed that Ms. Perez had been his student at KIPP DC, he denied the other allegations. *Id.* at 104:19–105:7. He reportedly stated that Ms. Perez had run away from "a bad situation at home," that "she was trying to emancipate herself," and that "he was helping her with that" by offering her a temporary place to stay with him and his girlfriend. *Id.* He insisted "that he was trying to help and . . . resented being accused of bad conduct." *Id.* at 105:9–10. Ms. Herr conveyed this conversation to Mr. Philhower and Ms. Dresden and asked Coleman's colleagues whether they had seen him socially with a student-aged person, but "people hadn't really seen him with anyone." *Id.* at 108:4–109:17, 111:7-112:11.

At some point, Ms. Schaeffler from KIPP DC also called Capital City with the "concern" that Coleman and Ms. Perez were in a relationship. Schaeffler Dep. at 212:4–13. Ms. Herr

similarly testified that Ms. Schaeffler "made some comments to [her] about Alan not being a suitable person to be around young people." Herr Dep. at 124:7–15. However, Ms. Schaeffler allegedly represented that this "was not the reason why Alan had left KIPP DC." *Id.* at 127:12–15. Ms. Schaeffler testified that Capital City "said they were going to look into [the allegations between Coleman and Ms. Perez], and they did, and they didn't find anything that seemed to be true to that nature." Schaeffler Dep. at 212:10–13. Ms. Schaeffler "did not further pursue" her inquiry into the allegations after hearing from Capital City. *Id.* at 213:2–6.

Ms. Perez ended her relationship with Coleman in 2009. FAC ¶ 112. She alleges that by 2015, she realized "that [her] relationship with Coleman had been wrong and abusive and asked him to resign from his teaching position" at Capital City. *Id.* ¶ 114. According to Ms. Perez, when Coleman refused to resign, she informed Capital City of the sexually abusive relationship, after which Capital City terminated him. *Id.* ¶ 116. In early 2016, Ms. Perez confided in a former teacher about the abuse she had suffered at the hands of Coleman, and that teacher reported Coleman's abuse to the police. *Id.* ¶ 117. Criminal proceedings commenced against Coleman in Maryland and the District of Columbia, and in 2017, Coleman pleaded guilty to sex abuse of a minor in Montgomery County, Maryland and to first-degree child sex abuse in the District of Columbia. *Id.* ¶ 122.

3. Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is only 'material' if it is capable of affecting the outcome of the litigation." *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 67

(D.D.C. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In assessing a motion for summary judgment, "all underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *Id.* at 68 (quoting *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010)).

"The party seeking summary judgment bears the 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* at 67 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-movant cannot, however, avoid summary judgment by "rest[ing] upon the mere allegations or denials of its pleadings." *Id.* at 68. Rather, the non-movant must establish that a material fact is genuinely disputed by citing to particular parts of materials in the record supporting its position or else demonstrate that the materials relied upon by the opposing party do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c)(1).

4. Analysis

Before turning to the parties' substantive arguments, the Court addresses a procedural concern. In responding to the parties' motions for summary judgment, Ms. Perez has failed to cite to a single piece of evidence in the record in support of her contentions. Ms. Perez's responses are therefore not compliant with the Federal Rules of Civil Procedure and this Court's Local Civil Rules. Specifically, Federal Rule of Civil Procedure 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support that assertion" by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). Furthermore, Local Civil Rule 7(h) provides that "[a]n opposition to [a motion for summary judgment] shall be accompanied by

a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue . . . which shall include references to the parts of the record relied on to support the statement." LCvR 7(h)(1).

"Although the submissions of a *pro se* litigant like [Ms. Perez] 'must be held to less stringent standards than formal [documents] drafted by lawyers,' when responding to a motion for summary judgment, 'even a *pro se* plaintiff must comply with the Federal Rules of Civil Procedure and this Court's local rules, including this Court's rules regarding responding to statements of material fact and marshalling record evidence.'" *Ware El v. Soc. Sec. Admin.*, No. 19-cv-1684 (GMH), 2020 WL 1853746, at *3 (D.D.C. Jan. 27, 2020) (quoting *Hedrick v. FBI*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016)). Accordingly, Ms. Perez's failure to comply with Rule 56(c) and Local Civil Rule 7(h) would justify the Court in deeming KIPP DC's and Capital City's statement of facts as admitted. *See* LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such fact is controverted in the statement of genuine issues filed in opposition to the motion."); *Thompson v. Veterans Canteen Serv.*, 156 F. Supp. 3d 22, 26 (D.D.C. 2016) (crediting the defendant's evidence where the *pro se* plaintiff failed to comply with Local Civil Rule 7(h)). Nevertheless, the Court will provide some leeway to Ms. Perez. Although the Court "will credit [Defendants'] evidence," *id*, it will also attempt to glean from Ms. Perez's assertions any pieces of evidence she appears to reference and, to the extent possible, apply that evidence in analyzing the merits of Defendants' motions for summary judgment.[12]

[12] On August 21, 2025, Ms. Perez's former counsel filed an opposition to KIPP DC's motion for summary judgment. *See* Pl.'s Opp'n to KIPP DC's Mot. Summ. J., ECF No. 92-1. Just days later, however, Ms. Perez terminated her counsel, and she indicated that she "w[ould]

Below, the Court addresses KIPP DC's and Capital City's arguments with respect to (1) gross negligence; (2) grossly negligent hiring, supervision, and retention; (3) intentional infliction of emotional distress; and (4) premises liability. The Court concludes that Defendants are entitled to summary judgment on all claims.[13]

*a. Gross Negligence*

Under District of Columbia law, "[a] public charter school . . . shall be immune from civil liability . . . for any act or omission within the scope of [its] official duties unless the act or omission: (i) [c]onstitutes gross negligence [or] (ii) [c]onstitutes an intentional tort." D.C. Code § 38-1802.04(c)(17)(A). "To state a claim for negligence in the District of Columbia, a plaintiff must allege: '(1) the existence of a duty owed by the defendant to the plaintiff, (2) a negligent breach of that duty by the defendant, and (3) an injury to the plaintiff (4) proximately caused by the defendant's breach.'" *Wells v. Hense*, 235 F. Supp. 3d 1, 13 (D.D.C. 2017) (quoting *Powell*

---

not adopt or rely upon prior counsel's August 21, 2025, filings." Not. of Filing of Pl.'s LCvR 7(m) Meet & Confer Statement at 2, ECF No. 153. Defendants then moved to strike former counsel's August 21 filings and for a scheduling order to set Ms. Perez's deadline to respond to its dispositive motions. Defs.' Mot. Strike & Scheduling Order, ECF No. 145. Ms. Perez eventually filed her own opposition to KIPP DC's motion for summary judgment. *See* Pl.'s Opp'n to KIPP DC's Mot. Summ. J., ECF No. 170. In view of Ms. Perez's representations, the Court grants Defendants' motion to strike former counsel's August 21 filings but denies their motion for a scheduling order as moot. Although the Court is striking former counsel's opposition to summary judgment, the Court nevertheless considered former counsel's arguments, including the affidavits, deposition transcripts, and other record evidence attached to the motion. The Court's review of these materials does not change its conclusion that summary judgment on all claims is warranted in favor of KIPP DC and Capital City.

[13] The Court denies Ms. Perez's motion for oral argument on Defendants' motions for summary judgment. *See* Pl.'s Mot. Oral Arg., ECF No. 181. Ms. Perez claims that oral argument would assist the Court in "clarifying the scope of the factual disputes presented," "addressing the proper Rule 56 framework where credibility and notice are contested," "ensuring that any ruling is grounded in the governing standards and limited to issues that may be resolved as a matter of law," and discussing "the treatment of record evidence and the application of Local Civil Rule 7(h). *Id.* at 2–3. The Court finds, however, that oral argument would not have aided the disposition of the motions for summary judgment. *See* LCvR 7(f).

*v. District of Columbia*, 602 A.2d 1123, 1133 (D.C. 1992)). Where, as here, "there is a statute that precludes liability for ordinary negligence, courts have defined gross negligence as 'such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety as others.'" *Id.* (quoting *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997)). "That standard connotes that the actor has engaged in conduct so extreme as to imply some sort of bad faith." *Goodrich v. Bank of Am. N.A.*, 136 F.4th 347, 357 (D.C. Cir. 2025) (citation modified). Absent "evidence of subjective bad faith," the plaintiff must show that the actor "disregard[ed] a risk so obvious that the actor must be taken to be aware of it and so great as to make it highly probable that harm would follow." *Walker*, 689 A.2d at 44 (citation modified).

District of Columbia law also provides that school officials and teachers are "mandatory reporters." D.C. Code § 4-1321.02(a). In 2007, the District's mandatory reporter statute required a school official or teacher "who knows or has reasonable cause to suspect that a child known to him or her in his or her professional or official capacity has been, or is in immediate danger of being, the victim of 'sexual abuse' or 'attempted sexual abuse' prohibited by [Chapter 30 or Title 22]" to report that "knowledge, information, or suspicion to the Metropolitan Police Department or the Child and Family Services Agency." *Id.* § 4-1321.02(e) (effective April 24, 2007). "[T]his statute impose[s] a duty on school officials to report reasonable suspicions of sexual harassment by a student's teacher." *Doe v. Duke Ellington Sch. of Arts Project*, No. 1:21-CV-1762 (DLF), 2022 WL 2274349, at *3 (D.D.C. June 23, 2022).

<u>*KIPP DC*</u>

With respect to KIPP DC, Ms. Perez alleges that the school owed duties to its students, including Ms. Perez, to maintain their health and safety; to supervise, monitor, and investigate

their interactions with employees; and to prevent employees from sexually abusing them. FAC ¶¶ 125–130. Ms. Perez argues that KIPP DC grossly breached these duties by failing to investigate or report suspicions of Coleman's inappropriate relationship with Ms. Perez, both when she was a student at KIPP DC and afterwards. *Id.* ¶ 133. Furthermore, she contends that KIPP DC failed to carry out its mandatory reporter obligations under D.C. Code § 4-1321.02. *See* Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 4–5.

The Court is sympathetic to Ms. Perez's plight. In the Court's view, there is no question that, while Ms. Perez was at KIPP DC, the school became aware of at least one interaction between Coleman and Ms. Perez that raised red flags and that, with further investigation, might have led to the discovery of Coleman's abuse. However, KIPP DC has presented evidence that it took reasonable steps to investigate the suspect interaction between Coleman and Ms. Perez and to satisfy itself that nothing untoward was taking place. Furthermore, ample evidence indicates that KIPP DC did not actually know or suspect that Coleman was sexually abusing Ms. Perez while she was a student at KIPP DC, and Ms. Perez has not cited materials in the record suggesting otherwise. Because Ms. Perez has failed to dispute KIPP DC's evidence, she cannot show that KIPP DC "fail[ed] to exercise even slight care to the degree it would shock fair-minded [individuals]," as required to establish that KIPP DC's conduct rose to the level of *gross* negligence. *Goodrich*, 136 F.4th at 357 (citation modified).

The Court begins with KIPP DC's lack of notice of Coleman's abuse. Unless KIPP DC had "prior notice" that Coleman could be a danger to Ms. Perez, the school cannot have "disregarded" an "obvious" and "highly probable" risk that Coleman would sexually abuse her. *Wells*, 235 F. Supp. 3d at 14. But as KIPP DC highlights, Ms. Perez herself testified that she never reported Coleman's abusive conduct to any KIPP DC employee while she was a student

there. *See* Perez Dep. at 82:6–9, 120:13–17. Furthermore, KIPP DC's current CEO, Shannon Hodge, testified that, other than the sexual abuse uncovered through this litigation, KIPP DC "[n]ever receive[d] any other complain[t]s" of a similar nature "about Alan Coleman" while he was still employed at KIPP DC. Hodge Dep. at 210:18–211:11. Indeed, the evidence in the record shows that KIPP DC did not learn or suspect that Coleman was in a relationship with Ms. Perez until her mother brought it to the school's attention in 2007, once Ms. Perez was no longer a student at KIPP DC. *See* Schaeffler Dep. at 147:4–13. The record also reflects that Ms. Weir and KIPP DC did not know that Coleman's sexual relationship with Ms. Perez dated back to her enrollment at KIPP DC until 2016, once the abuse was reported to the police. *See* Capital City's Mot. Summ. J. Weir Dep. at 86:1–6; Hodge Dep. at 130:11–131:10.

Ms. Perez nevertheless argues that KIPP DC had "constructive notice" and "reasonable cause" to suspect abuse. Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 6. She claims that "[t]he record contains evidence that KIPP DC administrators were aware of multiple circumstances independently warranting concern," including (1) "one-on-one access between Coleman and [Ms. Perez]," (2) "off-campus transportation connected to school activities," (3) "observations of physical injuries,"[14] (4) "internal acknowledgement that 'somewhat was off' regarding Coleman's conduct," and (5) "instructions to Coleman to limit behavior rather than escalate concerns." *Id.* at 4. However, the Court is not persuaded that Ms. Perez's referenced "circumstances" create a genuine dispute of fact precluding summary judgment.

[14] The Court is not aware of any record evidence that KIPP DC personnel observed physical injuries on Ms. Perez caused by Coleman. KIPP DC notes that during the 2002–2003 or 2003–2004 school year, Ms. Schaeffler observed "some bruises" on Ms. Perez's body, which she reported to the D.C. Child and Family Services Agency. *See* KIPP DC's Mot. Summ. J. at 7. But Ms. Perez testified that it was her godmother who "bruised [her] up" on that occasion. Perez Dep. at 193:5–194:20.

Because Ms. Perez has not cited to particular evidence, the Court is left to take its best guess as to which specific parts of the record she believes best support her claims. The "one-on-one access between Coleman and [Ms. Perez]" and "off-campus transportation connection to school activities" could refer to Coleman and Ms. Perez's outing to the movies and Coleman's practice of giving Ms. Perez rides home after drumline practice. According to KIPP DC, these were the only two situations known to the school during which Coleman interacted with Plaintiff after school hours. But on both occasions, KIPP DC reached out to Ms. Perez's mother to confirm that she had authorized these interactions. *See* Hayes Dep. at 181:9–16; Schaeffler Dep. at 133:11–134:14. Furthermore, with respect to the car rides, Ms. Hayes testified that the school's "expectation was that . . . [teachers] could take kids home"—and, in fact, other teachers also did so—"but [they] always need[ed] to have . . . parent permission." Hayes Dep. at 185:7–15, 186:5–14. Given this testimony, the Court does not believe that a reasonable jury could find that Ms. Hayes had reasonable cause to suspect that Coleman was dangerous. Indeed, Ms. Hayes explained that, once she confirmed that Coleman had Ms. Weir's permission to drive Ms. Perez home, she did not discuss appropriate boundaries with Coleman because the situation "didn't ring any flags . . . that something was off."[15] *Id.* at 185:21–186:4.

Coleman's outing with Ms. Perez to the movies presents a closer question. Ms. Perez appears to reference this incident in her assertion that KIPP DC "instruct[ed] Coleman to limit behavior rather than escalate concerns." Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 4. Ms. Schaeffler testified that after she learned of the outing, she told Coleman that one-on-one outings

---

[15] The Court is not aware of any "internal acknowledgement [by KIPP DC] that 'something was off' regarding Coleman's conduct," as Ms. Perez alleges. Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 4. To the extent Ms. Perez is referencing Ms. Hayes's testimony, Ms. Hayes in fact testified that she did *not* believe that "something was off" about Coleman's conduct.

with students "should not be happening" and instructed him to "make sure there's other people" during group activities. Schaeffler Dep. at 163:1–3. Viewed in the light most favorable to Ms. Perez, this evidence suggests that Ms. Schaeffler had found Coleman's conduct inappropriate and inconsistent with the conduct expected of a teacher. But that was not the end of Ms. Schaeffler's inquiry. Again, she also contacted Ms. Perez's mother, who confirmed that she knew about the outing and had authorized it. Schaeffler Dep. at 134:3–5; KIPP DC's Mot. Summ. J. Weir Dep. at 60:3–11, 61:15–18. And the record before the Court does not reflect that KIPP DC subsequently became aware of further one-on-one outings between Coleman and Ms. Perez. Regrettably, it turns out that these were, in fact, taking place. As KIPP DC recognizes, Ms. Perez "spent considerable time at Coleman's home with her mother's permission while she was [his] student," including on the weekends, when her mother would drop her off at his house. KIPP DC's Mot. Summ. J. at 10. Furthermore, Coleman apparently regularly took Ms. Perez "to the museum, movies, and out for meals." *Id.* But KIPP DC insists that the school did not know this at the time, and Ms. Perez has not produced evidence to the contrary.

Ultimately, the Court need not decide whether a reasonable jury, on these facts, could find that Ms. Schaeffler was put on constructive notice that Coleman could be dangerous to Ms. Perez. Regardless, Ms. Perez's gross negligence claim would fail because the record does not show that KIPP DC thereafter acted in "wanton, willful and reckless disregard" of Ms. Perez's safety. *Walker*, 689 A.2d at 44. Ms. Schaeffler did not, for example, fail to investigate or address the outing; she confirmed that Ms. Perez had obtained her mother's permission for the outing and she conveyed to Coleman that one-on-one outings were against school policy. Schaeffler Dep. at 134:3–5, 163:1–6; KIPP DC's Mot. Summ. J. Weir Dep. at 60:3–11, 61:15–18. And as Ms. Perez herself acknowledges, KIPP DC "maintained mandatory reporter policies

and provided annual training regarding reporting suspected abuse under District of Columbia law." Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 2. "[T]he fact that a party took steps to ensure safety and security militates against a finding of gross negligence." *Lynch v. Masters Sec.*, 126 A.3d 1125, 1135 (D.C. 2015).

Finally, Ms. Perez appears to assert a negligence *per se* claim based on KIPP DC's conduct after Ms. Perez left the school. In the summer of 2007, after Ms. Perez left her mother's house, Ms. Weir reported to KIPP DC that Ms. Perez was living with Coleman and in a relationship with him. Hayes Dep. at 211:12–19, 214:14–18. In response, Ms. Hayes and Ms. Schaeffler detailed the situation to a police officer who happened to be on KIPP DC's campus that day, but the officer told them that because Ms. Perez, who was then seventeen years old, was at the age of consent, there was nothing KIPP DC could do.[16] Schaeffler Dep. at 175:2–8; Hayes Dep. at 215:17–216:2. Based on these facts, Ms. Perez argues that, by 2007, KIPP DC had actual or constructive notice of Coleman's sexual abuse, and that a reasonable jury could thus find that the school's mandatory reporting obligations under D.C. Code § 4-1321.02 were triggered but not fulfilled. Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 4–5.

This argument lacks legal support. In 2007, the mandatory reporter statute imposed a duty to report suspected sexual abuse of "a child known to [a school official or teacher] in his or her professional or official capacity." D.C. Code § 4-1321.02(e) (2007). But by 2007, Ms. Perez was no longer a student at KIPP DC and thus no longer "known" to KIPP DC personnel in a professional or official capacity. Although District of Columbia courts do not appear to have addressed this precise issue, courts in other jurisdictions have refused to impose a reporting

[16] The Court expresses no view as to whether the police officer's legal conclusion regarding the age of consent was correct.

obligation on schools pursuant to similar statutes with respect to students no longer in their custody. *See, e.g.*, *May v. State*, 295 Ga. 388, 399, 761 S.E.2d 38, 45 (2014) (construing Georgia's mandatory reporter statute not to impose a legal obligation on a teacher to report a former student's sexual abuse because the teacher learned of the abuse only after the student was no longer enrolled at the school). This Court believes that a similar holding here best comports with the text of § 4-1321.02(e), which referred to children "known" to mandatory reporters in their professional or official capacity, not children "known or previously known" to them. D.C. Code § 4-1321.02(e) (2007). This approach is also consistent with the common law. *See May*, 295 Ga. at 398 ("[U]nderstanding the obligation to report as one limited to children to whom the mandatory reporter attends is consistent with the general approach of the common law."). This Court therefore declines to construe § 4-1321.02(e) as imposing a duty to report on KIPP DC even after Ms. Perez's enrollment at the school ended.

KIPP DC adds that Ms. Perez's negligence *per se* claim also fails because § 4-1321.02(e) limited the duty to report to known or suspected sexual abuse of a "child"—defined in Chapter 30 of Title 22 as "a person who has not yet attained the age of 16 years," D.C. Code Ann. § 22-3001(3) (2007)—and Ms. Perez was seventeen years old when her mother reported her relationship with Coleman to KIPP DC. KIPP DC's Mot. Summ. J. at 26. However, although § 4-1321.02(e) incorporated the definition of "sexual abuse" and "attempted sexual abuse" in Chapter 30 of Title 22, it did not expressly incorporate the definition of a "child" from that same chapter. And Chapter 14 of Title 4—in which § 4-1321.02(e) was housed—did not provide its own definition of a "child." In the face of statutory ambiguity, the Court declines to determine whether KIPP DC's duty to report § 4-1321.02(e) was limited to children under the age of sixteen. In any event, because Ms. Perez was no longer a student at KIPP DC when the school

learned of her relationship with Coleman from her mother, KIPP DC no longer owed her a duty to report under § 4-1321.02(e).[17]

<u>*Capital City*</u>

As with her allegations against KIPP DC, Ms. Perez argues that Capital City grossly breached duties of care owed to Ms. Perez. FAC ¶ 169. Although Ms. Perez was never a student at Capital City, she alleges that the school owed a "duty to minors," regardless of enrollment status, whom it knew or reasonably suspected to have been sexually abused by a school employee. *Id.* ¶ 167; Pl.'s Opp'n to Capital City's Mot. Summ. J. at 5. She argues that Capital City was grossly negligent in failing to adequately investigate allegations of Coleman's inappropriate relationship with Ms. Perez that her mother brought to the school's attention in the fall of 2007. FAC ¶ 169. She also contends that Capital City failed to comply with the mandatory reporter statute, D.C. Code § 4-1321.02(e) (2007). *Id.*

The Court acknowledges that both Ms. Perez's mother and Ms. Schaeffler reported to Capital City that Ms. Perez, seventeen years old at the time, was living with Coleman and in a relationship with him, and that Capital City decided not to investigate or report the allegations to the police after Coleman vehemently denied them. Herr Dep. at 75:9–81:4, 103:11–105:10, 108:4–112:11, 124:7–15; Schaeffler Dep. at 212:4–13. Capital City emphasizes in its motion that Ms. Weir brought no proof to school administrators, that Coleman's colleagues had never seen him socially with a student-aged person, and that Coleman offered a plausible (but, in

[17] For the same reason, the Court need not decide whether KIPP DC did, in fact, satisfy § 4-1321.02(e) when it consulted a police officer on KIPP DC's campus regarding Ms. Weir's allegations that Ms. Perez was in a relationship with Coleman. Ms. Perez argues that whether seeking informal advice from a police officer satisfies the reporting obligation under the statute is a factual question for the jury. Pl.'s Opp'n to KIPP DC's Mot. Summ. J. at 5. But because that obligation ceased to exist after Ms. Perez left KIPP DC, such a factual dispute, even if genuine, would not be material to this claim.

hindsight, false) story that Ms. Perez had run away from home and he was simply offering her a temporary place to stay. Capital City's Mot. Summ. J. at 11–12.

Whether, based on this evidence, a reasonable jury could find that Capital City had actual or constructive notice of Coleman's sexual abuse of Ms. Perez is a close question, and one that the Court need not decide. As the Court has previously explained, there is no legal support in the District of Columbia for Ms. Perez's contention that Capital City owed Ms. Perez a common law duty of care even though she was never enrolled at Capital City. As Capital City observes, "while the District of Columbia has recognized that a school owes 'an obligation to supervise the activity of students when the school is entrusted with their case,' no such duty has been extended to non-students." Capital City's Mot. Summ. J. at 14 (quoting *District of Columbia v. Royal*, 465 A.2d 367, 369 (D.C. 1983)). If Capital City did not owe Ms. Perez a legal duty, it cannot have grossly breached that duty. Likewise, the Court finds no legal support for Ms. Perez's claim that Capital City owed non-students like herself a statutory duty to report suspected sexual abuse under § 4-1321.02(e). Accordingly, Ms. Perez's gross negligence and negligence *per se* claims against Capital City fail as a matter of law.[18]

[18] Ms. Perez's allegation that "Capital City owed a duty to minors lawfully on their premises who were subject to sexual abuse, sexual harassment, and misconduct" does not change the Court's conclusion. FAC ¶ 167. In her complaint, Ms. Perez alleged that "[b]etween 2006 and 2009, Coleman brought [her] to his classroom at Capital City over the summers before school started and on weekends, while other employees and teachers were present on campus." FAC ¶ 64. But Ms. Perez has not produced record evidence showing that Capital City was aware or should have been aware that Coleman was bringing her to campus. Even Ms. Perez's standard of care expert, Dr. Grant, testified that she did *not* intend to offer an opinion "that Capital City breached the standard of care by failing to report the activity when Miss Perez was coming to campus with Mr. Coleman in the summers." Capital City's Mot. Summ. J. at Ex. G, Dep. of Dr. Billie-Jo Grant at 147:15–148:17, ECF No. 87-9.

*b. Grossly Negligent Hiring, Supervision, and Retention*

Under District of Columbia law, "an employer owes a duty to third persons, based on the conduct of its employees, to use reasonable care to select competent employees and to fire incompetent employees." *Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 127 (D.D.C. 2012). To prove her grossly negligent hiring claims, Ms. Perez must show that KIPP DC and Capital City were grossly "negligent in selecting" Coleman and the "negligent hiring caused [Ms. Perez's] harm." *Levy v. Currier*, 587 A.2d 205, 205, 211–12 (D.C. 1991). As for her grossly negligent retention and supervision claims, Ms. Perez must show that KIPP DC and Capital City "knew or should have known [Coleman] behaved in a dangerous or otherwise incompetent manner, and that the [schools], armed with that actual or constructive knowledge, [grossly] failed to adequately supervise [Coleman]." *Jenkins v. District of Columbia*, 223 A.3d 884, 898 (D.C. 2020) (citation modified); *see also Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261, 265 n.1 (D.D.C. 2016) ("D.C. case law does not appear to distinguish between 'negligent supervision' and 'negligent retention.'").

<u>*KIPP DC*</u>

Ms. Perez's grossly negligent hiring claim against KIPP DC is without merit. "An employer cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person's background or if such an investigation would not have revealed any reason not to hire that person." *Jograj v. Enter. Servs., LLC*, 270 F. Supp. 3d 10, 23 (D.D.C. 2017) (quoting *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 230 (D.D.C. 2015)). Here, KIPP DC has produced evidence that it conducted a reasonable investigation into Coleman's background before hiring him, which included a background check and reference checks. Schaeffler Dep. at 87:4–20; Hodge Dep. at 158:2–6. KIPP DC's investigation did not reveal any

reason not to hire Coleman. He did not disclose any prior convictions, except "minor traffic offenses." KIPP DC's Mot. Summ. J. at Ex. E, ECF No. 86-5. He was also qualified for the position, having previously worked at a "runaway shelter," "Teach for America," and "DC Public Schools." Schaeffler Dep. at 102:2–17. Because Ms. Perez has presented no evidence that KIPP DC's "background-investigation procedures were not reasonably calculated to discover a 'red flag' in [Coleman's] past," her grossly negligent hiring claim against KIPP DC cannot proceed. *Search*, 128 F. Supp. 3d at 230.

The record evidence also cannot support Ms. Perez's grossly negligent supervision and retention claim. Without actual or constructive notice of Coleman's dangerous behavior "before the incident at issue," KIPP DC "cannot be liable for failure to supervise." *Lockett v. Metro. Police Dep't*, No. 1:22-cv-2935 (CJN), 2023 WL 4824735, at *2 (D.D.C. July 27, 2023). But there is no evidence that KIPP DC knew about or even suspected Coleman's sexual abuse while Coleman was still employed at KIPP DC. The record before the Court shows that KIPP DC became aware that Ms. Perez was with Coleman after school hours on only two occasions. As explained previously, the Court does not believe that a reasonable jury could infer from the first occasion—when Ms. Hayes learned that Coleman was giving rides to Ms. Perez and another student—that KIPP DC had constructive knowledge of Coleman's dangerous conduct. As for the second occasion—when Ms. Schaeffler learned that Coleman had taken Ms. Perez on a one-on-one outing—the Court again need not reach a definitive conclusion regarding constructive notice. A *grossly* negligent supervision and retention claim requires Ms. Perez to show that, armed with constructive knowledge of Coleman's dangerous conduct, KIPP DC supervised Coleman in such a deficient manner as to imply a "wanton, willful and reckless disregard" of Ms. Perez's safety. *Walker*, 689 A.2d at 44. Ms. Schaeffler's response to the situation falls short

of that standard. She made sure to instruct Coleman that one-on-one outings "should not be happening." Schaeffler Dep. at 163:1–3. Furthermore, there is no evidence that KIPP DC subsequently became aware of other one-on-one outings, which should have given the school reason not to trust that Coleman would follow that instruction. The Court does not believe that a reasonable jury could find KIPP DC liable for grossly negligent supervision and retention based on the evidence described.

*Capital City*

Ms. Perez's grossly negligent hiring claim against Capital City fails because she has presented no evidence that Capital City "[f]ail[e]d to undertake a proper background check before hiring Coleman." FAC ¶ 183. In fact, Capital City's evidence shows that the school did perform a background check, which revealed nothing of concern. *See* Capital City's Mot. Summ. J. at Ex. Q. And Ms. Perez's standard of care expert even testified that, based on the information available to her, she did not intend to offer an opinion that Capital City deviated from the standard of care by hiring Coleman. Grant Dep. at 165:5–166:1.

Ms. Perez also cannot prevail on her grossly negligent supervision and retention claim against Capital City because there is no evidence before the Court that Capital City was aware that Coleman had ever brought Ms. Perez to its campus. "The cause of action for negligent supervision . . . recognizes that an employer owes specific duties to third persons based on the conduct of its employees." *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007). But Capital City's duties cannot have extended to Ms. Perez based on Coleman's conduct outside of the school. As Capital City observes, "there is no evidence that supervising Coleman in the performance of his duties as a Capital City employee would have discovered anything" between him and Ms. Perez taking place away from Capital City. Capital City's Mot. Summ. J. at 35–36.

Perhaps for this reason, Ms. Perez's standard of care expert testified that she did not intend to offer an opinion that "Capital City failed to regularly, consistently and effectively supervise Coleman." Grant Dep. at 195:2–7.

*c. Intentional Infliction of Emotional Distress*

To prove a claim of intentional infliction of emotion distress, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Smith v. Clinton*, 886 F.3d 122, 129 (D.C. Cir. 2018) (quoting *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013)). For the first element, "[t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* The bar for proving this tort is "very high." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 65 (D.D.C. 2014) (quoting *Hollis v. Rosa Mexicano DC, LLC*, 582 F. Supp. 2d 22, 26 (D.D.C. 2008)).

*<u>KIPP DC and Capital City</u>*

Ms. Perez's intentional infliction of emotional distress claims against both KIPP DC and Capital City are based on allegations that the schools "acted with conduct that was extreme and dangerous" and did so either "deliberately with the goal of causing extreme emotional distress to [Ms. Perez]" or "with reckless indifference to Shanique's rights and well-being." FAC ¶¶ 190–92. Such conduct allegedly included "[p]ermitting Coleman to sexually abuse [Ms. Perez]" by failing to investigate and report concerns regarding Coleman's inappropriate relationship with Ms. Perez and failing to supervise, monitor, and train staff to handle reports of sexual assault. *Id.* ¶ 194. But there is simply no evidence in the record to support allegations of extreme and dangerous conduct on the part of KIPP DC or Capital City. For the reasons explained above,

Ms. Perez has not shown that KIPP DC and Capital City grossly breached any duties of care owed to her. Her intentional infliction of emotional distress claims, premised on essentially the same conduct, therefore cannot survive. To be sure, the Court cannot say that KIPP DC and Capital City went above and beyond their obligations, to the extent the law imposed any, to prevent the years of trauma, pain, and abuse that Ms. Perez suffered due to Coleman's actions. But even if KIPP DC or Capital City "f[e]ll[ ] short of the mark," any "mistakes and missteps" revealed in the record evidence "do not rise to the level of extreme and outrageous conduct" required to prove intentional infliction of emotional distress. *Paavola v. United States*, 459 F. Supp. 3d 21, 42 (D.D.C. 2020).

*d. Premises Liability*

A school owes a duty to its students "to exercise reasonable and ordinary care for the protection of pupils to whom it provides an education." *District of Columbia v. Doe*, 524 A.2d 30, 32 (D.C. 1987). But schools are "not the insurer of the complete safety of school children," nor are they "strictly liable for any injuries which may occur to them." *District of Columbia v. Cassidy*, 465 A.2d 395, 398 (D.C. 1983). Instead, a school's duty to supervise its students is limited to "a reasonable duty to guard against foreseeable harm." *Thomas v. City Lights Sch., Inc.*, 124 F. Supp. 2d 707, 710 (D.D.C. 2000). Furthermore, in cases like this one "where an injury is caused by the intervening criminal act of a third party, a defendant is liable for negligence only if the danger of that act 'should have been reasonably anticipated and protected against.'" *Doe*, 524 A.2d at 32 (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1987)). "In other words, because of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown." *Lacy*, 424 A.2d at 323. To make this "heightened showing of foreseeability," the plaintiff "bears the burden of establishing

that the criminal act was so foreseeable that a duty arises to guard against it." *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997) (citation modified).

In her premises liability claim against KIPP DC, Ms. Perez alleges that KIPP DC "failed to act with reasonable care to protect [her] . . . from foreseeable dangers of which KIPP DC had ample notice," including sexual abuse and harassment. FAC ¶ 159. However, in the Court's view, the record evidence does not establish that the risk of sexual abuse and harassment was so foreseeable to KIPP DC as to render the school liable for gross negligence under a premises liability theory.[19] "[A] heightened showing of foreseeability in cases involving intervening criminal conduct . . . does not require previous occurrences of the particular type of harm, but can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *Doe*, 524 A.2d at 33. In *Lacy*, as here, "[t]he immediate cause of the injury complained of . . . was the intervening act of a third party," in that case a school janitor who sexually assaulted a student. 424 A.2d at 323. As the D.C. Court of Appeals later explained in a different case, that injury was not particularly foreseeable to the school in *Lacy* because "the likelihood of sexual assault by a trusted school employee was remote." *Doe*, 524 A.2d at 34. Here, too, Coleman was, in KIPP DC's view, a trusted school employee. There is no evidence that KIPP DC had received prior complaints about sexual abuse or harassment by Coleman or that KIPP DC knew or suspected that he was sexually abusing Ms. Perez while he was at KIPP DC. At minimum, the Court agrees with KIPP DC that Coleman's criminal conduct was not so foreseeable as to suggest that the school acted in "bad faith" or otherwise in

[19] The Court agrees with KIPP DC that because the school is "immune from civil liability" for acts and omissions other than those constituting "gross negligence" or "an intentional tort," D.C. Code § 38-1802.04(c)(17)(A), a gross negligence standard must apply to Ms. Perez's premises liability claim.

"disregard of a risk so obvious . . . as to make it highly probable that harm would follow." KIPP DC's Mot. Summ. J. at 33 (quoting *Walker*, 689 A.2d at 44).

## IV. CONCLUSION

For the foregoing reasons, KIPP DC's motion for summary judgment (ECF No. 86) is **GRANTED**; Capital City's motion for summary judgment (ECF No. 87) is **GRANTED**; Defendants' motions in limine (ECF Nos. 84, 85, 88, 89) are **GRANTED AS CONCEDED**; KIPP DC's motion for a preliminary injunction (ECF No. 95) is **GRANTED IN PART**; Defendants' motion to strike and for a scheduling order (ECF No. 145) is **GRANTED IN PART** and otherwise **DENIED AS MOOT**; and Plaintiff's miscellaneous motions (ECF Nos. 97, 100, 101, 102, 103, 106, 113, 132, 133, 146, 158, 168, 169, 181, 184, 185) are **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: October 6, 2026

RUDOLPH CONTRERAS
United States District Judge